IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 1, 2004 Session

# STATE OF TENNESSEE v. ROBERT L. LEACH, JR.

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 99-D-2508     J. Randall Wyatt, Judge**

---

**No. M2001-01421-SC-DDT-DD - Filed September 8, 2004**

---

In this capital case, the defendant, Robert L. Leach, Jr., was convicted of two counts of first degree premeditated murder, two counts of first degree felony murder, one count of especially aggravated robbery, and one count of aggravated rape. The trial court merged the felony murder convictions with the premeditated murder convictions. The jury imposed sentences of death for the two murder convictions. The trial court imposed two consecutive sentences of twenty-five years for the especially aggravated robbery and aggravated rape convictions, which were ordered to run consecutively to the two death sentences. The Court of Criminal Appeals affirmed Leach's convictions and sentences. On automatic appeal under Tennessee Code Annotated section 39-13-206(a)(1), we designated the following issues for oral argument:[1] 1) whether the evidence is insufficient to support convictions for premeditated murder and felony murder; 2) whether the trial court erred in prohibiting Leach from presenting a witness to discredit the testimony of Joseph Walker; 3) whether the trial court committed reversible error in instructing the jury to consider evidence of Leach's attack on Dorianne Brown to "complete the story"; 4) whether the death penalty is precluded in this case under Apprendi v. New Jersey, 530 U.S. 466 (2000), because aggravating circumstances were not set out in the indictment; and 5) whether the sentences of death are disproportionate or invalid under the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1). Having carefully reviewed these issues and the remainder of the issues raised by Leach, we conclude that they do not warrant relief. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. R. Sup. Ct. 12(2) (2004) (emphasis added).

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, and WILLIAM M. BARKER, JJ. joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

Ross E. Alderman, District Public Defender; and Jeffrey A. DeVasher and C. Dawn Deaner (on appeal), and Laura C. Dykes, Deputy Public Defender (at trial), and Amy D. Harwell, Assistant Public Defender (at trial), for the appellant, Robert L. Leach, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Thomas B. Thurman, Deputy District Attorney General; and Kathy Morante and Katrin Novak Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

The State's proof at trial showed that Leach arrived by bus in Nashville in June 1999. Leach had left Missouri to pursue a career in music and to avoid revocation of his parole on a Texas burglary conviction. By early July 1999, he was working as a server at a Denny's restaurant in south Nashville and living at a nearby Econo Lodge hotel.

Around 3:00 a.m. on July 8, 1999, Leach forced his way into the room of Dorianne Brown, an Econo Lodge employee who lived at the hotel, and started to choke her. When someone knocked on the door, Leach pulled out a knife and told Brown not to say anything. After the person at the door left, the telephone rang and distracted Leach. Brown ran out of the room to the hotel office and asked for the police to be called. When the police arrived, Leach was gone.

Around 7:00 a.m. that same morning, Louise Howard telephoned her sister, Sarah McBride, a sixty-nine-year-old widow who lived about a mile from the Econo Lodge. McBride's cousin, seventy-year-old Jean Poteet, was staying with McBride. As a result of a stroke suffered at birth, Poteet had diminished mental capabilities and her right hand and right leg were partially paralyzed. Poteet wore a leg brace from her knee to her ankle. McBride indicated on the telephone that there was a man in her kitchen drinking coffee while he waited for his sister to pick him up. Howard told McBride, "Sarah, get that man out of the house, and put him on the patio." McBride responded, "Okay. I'll call you later." Howard left to go shopping. When Howard returned, she was unable to reach McBride by telephone and went to McBride's house around 1:00 p.m. The garage door was up, and McBride's 1982 Dodge truck was missing. The back door to the house was open. Howard went inside and discovered the bodies of Poteet and McBride.

Poteet's wig and a pair of scissors were on the kitchen floor next to the table. A trail of blood led from the kitchen to the doorway of the master bedroom where Poteet was lying face down with

2

her blouse pulled up and knotted around her throat. A pair of black jeans was next to Poteet's head. McBride was lying on her back on the bed. She was naked from the waist down, and her legs were open and bent up over her body. A belt was tightened around her neck. Both women had been stabbed and showed signs of blunt trauma to the head.

Dr. Bruce Levy, the Davidson County Medical Examiner, was called to the scene by the police and performed autopsies on the victims the following day. Dr. Levy determined that both women died as a result of ligature strangulation. Dr. Levy opined that the ligature had been placed around Poteet's neck in the kitchen and that she had been dragged to the bedroom while she was still alive. Congestion in her upper chest and face indicated that someone was sitting on her lower chest or abdomen when tying the ligature around her neck. Poteet had defensive wounds and also had suffered blunt force injuries to her face. She had been hit at least twice with enough force to cause bleeding to her brain. Like Poteet, McBride had suffered defensive wounds and had two sets of paired puncture wounds consistent with her being stabbed with scissors. McBride also had suffered multiple blunt force injuries to her head, including a laceration over her left eyebrow. Her nose, the bone between her eyes and brain, her breast bone, and three of her ribs had been broken. She suffered a laceration to her vaginal wall. Dr. Levy determined that McBride had been sexually assaulted and had died during the attack. Bruising on her ankles indicated that her legs were held during the rape.

The police investigation showed that someone had rummaged through the house. Chest drawers were pulled out, closet doors were open, a mattress had been moved, and jewelry boxes lay open. Bloody footprints were on the floor in the entrance hall and living room. A pair of socks was found in the sink in the bathroom off the master bedroom. A pair of men's underwear was later retrieved from the sewer line running from the toilet. McBride's purse and jewelry were missing as was the Dodge truck.

Forensic testing showed that Leach's left palm print was on a wall in McBride's house and that Leach's fingerprints were on a coffee mug on the kitchen table. After Leach's arrest, it was determined that bloody footprints from the floor in McBride's house matched Leach's tennis shoes and that sperm on the vaginal swab from McBride matched Leach's DNA.

Around 8:00 p.m. on July 8, Leach appeared in the area of Greenville, Missouri, driving McBride's truck. Leach went to the home of a friend, Harold Winberry, and announced that he had just come from Nashville. Leach, Winberry, Winberry's wife, and her sister, Becky Allen, went to the Friendly Tavern in Greenville, where they drank, danced and socialized until 2:00 a.m. Leach and Allen slept together that night and the next. Leach gave Allen a pair of McBride's earrings. Leach also stayed at the home of his aunt, to whom he offered McBride's leaf blower. During this time, Leach behaved normally, visited with other people, played his guitar and sang, and showed off the Dodge truck, claiming it was his own vehicle.

After Leach's identification had been confirmed by fingerprint evidence, Detective Mike Roland of the Nashville Police Department contacted Leach's sister, Cathy Watson, who lived in

Missouri. Watson in turn contacted Leach, who called Detective Roland on July 13. During the telephone call, Leach blamed all his problems on the Texas prison and parole system and threatened to go to Texas and "blow up a whole city block." Detective Roland had the call traced to a pay telephone in Wayne County, Missouri, where law enforcement officers were put on the alert for McBride's truck. Shortly thereafter, the truck was located outside the Friendly Tavern. Leach was inside playing guitar on the stage. After he was arrested, Leach said that he "was sorry he did it, but something just snapped." He claimed that he had been trying to get help for the past three years.

Detective Roland interviewed Leach in Missouri. Leach denied knowing anything about McBride and Poteet, but he talked to Roland about the incident with Brown at the Econo Lodge. Leach claimed that he had been drinking heavily that night and said that he had been talking to Brown in her room when a man came to the door and tried to rob him. Leach struck the man. When Brown screamed and ran out of the room, Leach also fled. Leach had no memory of what happened after he left the motel until he "came to" driving the Dodge truck in Illinois and wearing someone else's clothes. Leach said that at most he had stolen the truck and asserted that he would never hurt anyone except in self-defense. Nonetheless, during the interview, Leach remarked, "If I deserve it, I deserve it." He also told Roland that he had suffered headaches, black-outs, and memory loss ever since a metal plate had been put in his head after an automobile accident. During the trip back to Nashville, Leach pointed to the road where he had thrown away McBride's purse.

Joseph Walker, a convicted felon, met Leach while they were housed together in the Davidson County Jail in late December 1999. Walker testified that Leach asked Walker about the insanity defense. Leach stated that he was trying to go to a psychiatric facility because it would be easier to escape and flee to Canada, which would not extradite him if he was facing a death penalty. According to Walker, Leach related the following details of the murders. Leach told the women that his car was broken down and that he needed to call for a ride. One of the women recognized him from Denny's and offered him a cup of coffee. She received a telephone call instructing her to get him out of the house. He put a choke hold on one or both of the women, got them down on the floor, and beat their heads. He raped one woman and fondled the other. He went through the house, took some jewelry, went to the garage, took some lawn care equipment, and then left in a truck. Leach told Walker that there was blood all over the house. Leach also said that he had always had a secret fantasy of committing multiple rapes and homicides.

The only witness for the defense was Leach. He testified at length about his life before the murders. His parents separated when he was an infant. Leach rarely saw his father whom he described as a "cattle rustler." His father sometimes took Leach with him to commit burglaries. Leach said that his mother had a drinking problem and "hung out at the tavern." Leach related a history of sexual abuse by several people, including his babysitter, a neighbor, a stranger, and a stepbrother. Until Leach was fourteen, he had a bowel problem and would defecate in his pants almost every day. His mother would punish him by rubbing his nose in his feces; other children would tease him.

4

Leach admitted that when he was a child he set fires and was generally disruptive. He was placed in state custody at ten or eleven and was eventually transferred to a state hospital school at twelve. He quit school after the eighth grade. At fourteen he burglarized the same gas station four nights in a row and was sent to reform school for two years. After his release, he stayed with his father for only a month, traveled with a carnival for three months, and then moved back with his mother and grandmother. He returned to reform school for a year and was again released. When he set fire to a laundromat, he was placed in a mental hospital for evaluation and received a year in jail. When he was released, he broke into a house and set fire to it. Leach testified that he never burned anything after that incident.

In his late teens, Leach went to Texas, then to New Orleans, and back to Missouri to his mother. He became a Christian and worked at a Christian camp for a year and one-half. Leach testified that he left the camp at nineteen after he "fell away from God." After moving back to Missouri, he committed a robbery and served two years in prison before being paroled. He went to Texas, where he was convicted of burglary and sentenced to seven years on probation. He violated probation and was sent to a Texas prison, where he was gang raped.

Leach was on parole from 1988 until 1992. During that time, he bought a house and worked in the heating and air conditioning business. In 1993, he was in an automobile accident and had a metal plate put in his head. He violated parole and returned to prison for three and one-half years. While incarcerated, Leach was transferred from prison to prison. He described the Texas prisons as violent places full of beatings, killings, and rapes.

In February 1997, he was again released on parole and lived with his sister in Missouri until he felt that he was about to "snap" and went to live alone in the woods. Leach claimed to have won Star Search in 1997 and then to have gone to Branson, Missouri, where he was doing well until December 1998, when he was arrested for assault and resisting arrest. He was threatened with revocation of parole unless he participated in alcohol treatment. Although he successfully graduated from treatment, he continued to have trouble with his parole officer, and a parole violation warrant was issued against him. Frightened of returning to prison in Texas, Leach hid in the woods and took a bus to Nashville in June 1999.

Leach gave the following testimony concerning the events of July 8, 1999. Prior to that time, he had been suffering from headaches and depression until he felt "just like exploding." He said that he had gone out to drink after work, became intoxicated, and returned to the motel, where he saw Brown. He knocked on her door and went into her room, where they talked for several minutes. As he turned around to leave, "something controlled" him, and the next thing he knew he was on top of her. Brown pleaded with him not to hurt her, and he promised that he would not. A man knocked on the door. Afraid that the man would hurt him, Leach pulled out his pocket knife. The man left, but then the telephone rang. When Leach dove at Brown as she moved toward the telephone, Brown ran out the door. Leach fled until he came to an apartment complex, where he spent the rest of the night sleeping in the shrubbery.

5

When Leach awoke, he was angry and stressed. He went to a pay telephone at a convenience store to call his sister but left when a police officer arrived. As he walked along, he saw McBride watering flowers in her yard. Leach told McBride that his car had broken down and asked to use her telephone to call his sister. When his sister did not answer, Leach wanted to "buy time" and made up a story that his sister was on her way to get him. Leach drank some coffee while sitting with McBride on the front porch. When the telephone rang, McBride told Leach to go into the kitchen and get himself another cup of coffee while she answered the call. Leach saw Poteet sitting in the kitchen. Leach testified,

> I don't know what happened. I – I – the same thing at the hotel. It's something came over me. I heard a loud bang. The next thing I know I had Ms. Poteete [sic] in my arms. When I realized what had happened, I let go of her as she dropped to the floor. And I freaked out. I didn't understand it because I didn't plan it. And I heard a slam of a door. And I turned around and it was Ms. McBride, or that's her name, I think. And I just – I went blank.

Leach stated that he woke up in the shower with water hitting his face. He did not know where he was and was horrified to see the victims' bodies. He changed out of his bloody clothes. He took McBride's jewelry box and purse. He went outside, thought about setting the house on fire but "just blew it off," and left in McBride's truck. He blacked out again and awoke under a bridge on the Kentucky-Missouri border. He then drove several miles in the wrong direction before turning around and heading to Greenville, Missouri. On cross-examination, Leach denied ever talking with Walker about the facts of the case and said that Walker approached him with the idea of an insanity defense.

Based upon the above evidence, the jury convicted Leach of first degree premeditated murder of Jean Poteet, first degree premeditated murder of Sarah McBride, first degree felony murder (during the perpetration of robbery) of Jean Poteet, first degree felony murder (during the perpetration of robbery) of Sarah McBride, especially aggravated robbery of Sarah McBride, and aggravated rape of Sarah McBride. The trial court merged the felony murder convictions with the premeditated murder convictions.

At the penalty phase, the State presented proof that Leach was convicted in August 2000 of reckless aggravated assault and in May 1983 of robbery in the second degree. The State recalled Dr. Levy, who repeated that Poteet was conscious when the ligature was applied and that the victims would have remained conscious for thirty to forty seconds until they died three to four minutes later. He described strangulation as a very painful form of death. Dr. Levy also testified that the scissor stab wounds suffered by both victims would have been painful. Dr. Levy further stated that, although McBride may have been unconscious when the belt was placed around her neck, she was conscious when beaten and would have suffered pain from the vaginal tear and injuries to her head and chest.

6

The State presented three victim impact witnesses. The first witness was McBride's older sister, Louise Howard. She testified that McBride enjoyed working in her yard. She said that McBride was her best friend and that they did things together almost daily. She expressed her deep grief at losing her sister. The next witness was Poteet's cousin and legal guardian, William Harris. He described his relationship with Poteet as almost that of a brother. He testified that Poteet had the mental capacity of a very bright child and had gone to school through the sixth or seventh grade. Despite her handicaps, she was an excellent housekeeper and had faithfully cared for her parents and Harris' mother until they died. The last witness for the State was McBride's stepson, Robert McBride. He testified that his father and McBride had been married for twenty-seven years until his father's death in 1992. Although McBride grieved for her husband, she had eventually come to enjoy life again. He stated that the murder had a horrible impact on him and related how his youngest daughter, who was eight when the killings occurred, wanted to avoid going near McBride's house.

In mitigation, the defense presented the testimony of several witnesses who corroborated Leach's account of his life before the murders. Leach's aunt, Jane Henson, testified that Leach's father had been a womanizer who cared nothing for his children and that Leach's mother was mean to Leach because he resembled his father. Another aunt, Judy Waltz, stated that Leach came to live with her when he was twenty-six or twenty-seven. He was very courteous, but she had to ask him to leave because of his drinking and his infatuation with her daughter. After he moved out, Leach had a successful roofing business but lost it because of his drinking. Leach's childhood friend, Richard Bennett, told how Leach's mother would beat Leach and punish him by putting him in a closet. Bennett described Leach as a troubled child, tortured by other children because he was passive and soiled his pants. Bennett related that Leach frequented the home of a known pedophile when he was a child. Leach's sister, Cathy Watson, testified that, when Leach was paroled from the Texas prison in 1997, he had changed and was paranoid and scared. Watson also stated that on the morning of July 8, 1999, she had heard her telephone ring but did not answer it because she was sick.

Two other defense witnesses, Carol Duma and Reverend Harry Duma, testified about their contact with Leach. Mrs. Duma taught Leach in kindergarten and described him as fearful and apprehensive. Both testified about their positive experience with Leach when he worked for them at a Christian camp in his late teens. Leach seemed to do well, but at times he would "snap" and frighten people. Reverend Duma described Leach as "very, very lonely."

Another mitigation witness was Ann LaPoint, a nurse and licensed social worker from Texas, who counseled Leach for seven to eight years while he was on parole. LaPoint characterized Leach as immature, depressed, angry, needy, delusional, and suffering from low self-esteem. Describing him as "a five-year-old in a twenty or thirty-year-old body," she said that she had to teach Leach how to dress appropriately and comb his hair. She confirmed that Leach was afraid of going back to prison because he had been beaten and sexually assaulted there. She testified that Leach had tried to commit suicide by jumping off a bridge, hanging himself, and running his car into a bridge embankment. On cross-examination, LaPoint admitted that Leach had played mind games with her "like a typical substance abuser," had attempted to falsify a urinalysis, had trouble with authority,

7

and "wanted to blame the world and society for his shortcomings instead of accepting responsibility for his actions."

Based upon this proof, the jury found that the State had proven beyond a reasonable doubt the following statutory aggravating circumstances with regard to both victims: 1) the defendant was previously convicted of one or more felonies (reckless aggravated assault and robbery), other than the present charge, whose statutory elements involve the use of violence to the person; 2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and 3) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing or attempting to commit robbery or aggravated rape. Tenn. Code Ann. § 39-13-204(i)(2), (5), (7) (1997). As to victim Jean Poteet, the jury also found that the State had proven beyond a reasonable doubt a fourth statutory aggravating circumstance: the victim was seventy years of age or older or was particularly vulnerable due to a significant handicap or significant disability, whether mental or physical, and at the time of the murder the defendant knew or reasonably should have known of such handicap or disability. Tenn. Code Ann. § 39-13-204(i)(14) (Supp. 1998). The jury further found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Leach to death for the murders of Jean Poteet and Sarah McBride.

## ANALYSIS

### Sufficiency of Evidence

Leach challenges the sufficiency of the evidence to support the convictions for first degree premeditated murder and first degree felony murder. He does not dispute that he killed the victims. Instead, he argues that the evidence is insufficient to support the convictions for premeditated murder because the State failed to prove premeditation. He argues that the evidence is insufficient to support the convictions for felony murder because the State failed to prove that he intended to rob the victims either prior to, or contemporaneous with, their murders.

When the sufficiency of the evidence is challenged, the standard of review is whether, considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Questions regarding the credibility of witnesses, the weight and value of the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. Id.

#### *First Degree Premeditated Murder*

First degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Premeditation is defined as follows:

As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997).

Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done "after the exercise of reflection and judgment" as required by Tennessee Code Annotated section 39-13-202(d). Davidson, 121 S.W.3d at 615. We previously have identified the following circumstances as supporting a finding of premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). However, these factors are not exhaustive. Davidson, 121 S.W.3d at 615. Establishment of a motive for the killing is a factor from which the jury may infer premeditation. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). Premeditation also may be inferred from the use of multiple weapons in succession. State v. Bush, 942 S.W.2d 489, 501-502 (Tenn. 1997). Moreover, evidence of repeated blows is relevant to establish premeditation, although this evidence alone is not sufficient to establish premeditation. State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001).

We conclude that the evidence, when examined in the light most favorable to the State, was sufficient to support a finding of premeditation. Leach inflicted multiple wounds upon each victim during the particularly cruel killings. Leach used two weapons – scissors and a ligature – on each of the unarmed victims. Leach attempted to dispose of evidence by flushing his underwear down the toilet. Leach exhibited calmness after the murders by showering, changing his clothes, looking for valuables, and then driving to Missouri where he socialized with friends at a tavern that night. Although Leach made no prior threats or declarations of intent to kill McBride and Poteet, he told Walker after the murders that he had always had a secret fantasy of committing multiple rapes and homicides. Even without Walker's testimony, however, the jury could have reasonably inferred that Leach acted with premeditation when, desperate to leave Nashville to escape arrest for attacking Brown, he killed McBride and Poteet to obtain the means of facilitating his flight and to prevent them from alerting the police.

### First Degree Felony Murder

First degree murder includes a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (1997). Robbery is defined as

9

"the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997).

To support a felony murder conviction, the intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). Although the intent to commit the underlying felony cannot be presumed from the act of committing the felony, a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to or concurrent with the killing. Id. at 108.

We conclude that the evidence, when viewed in the light most favorable to the State, was sufficient to establish that the intent to commit the underlying felony of robbery existed prior to the acts causing the victims' deaths. On the morning of the murders, Leach was evading the police because of his attack on Brown. His telephone call to his sister went unanswered. Leach lied to McBride about the success of the call in order to "buy time." After the murders, Leach had the truck and money he needed to flee Nashville. From this evidence, the jury could have reasonably inferred that Leach had formed the intent to rob the victims prior to their murders.

**Evidence to Discredit Testimony of Joseph Walker**

Leach asserts that the trial court erred in prohibiting him from presenting a witness to discredit the testimony of Joseph Walker. As noted above, Walker testified about incriminating statements made by Leach while they were incarcerated in the Davidson County Jail. Walker stated on cross-examination that while at Middle Tennessee Mental Health Institute ("MTMHI") in December 1999 he had refused to answer certain questions. He denied telling evaluators at MTMHI that he had only been arrested for minor offenses, that he could not read, and that he had only a sixth-grade education. Leach sought permission from the trial court to call Dr. Joseph Mount, a psychologist at MTMHI, to impeach Walker with evidence that he had lied to evaluators about his criminal record and personal information. Leach also requested that Dr. Mount be permitted to testify that he diagnosed Walker as suffering from an adjustment disorder and concluded that Walker was malingering and attempting to manipulate the evaluation process. The trial court ruled that, under the plain language of Rule 608(b)[2] of the Tennessee Rules of Evidence, Leach was precluded from presenting extrinsic evidence regarding Walker's alleged lies. Even if Dr. Mount's proffered testimony was admissible, the trial court ruled that it should be excluded under Rule 403 of the Tennessee Rules of Evidence because it could confuse and mislead the jury and cause undue delay.

On appeal, Leach has abandoned his argument that Dr. Mount's testimony was proper impeachment evidence under Rule 608 and now contends that the testimony was admissible under Rules 613 and 616 of the Tennessee Rules of Evidence. These theories were not presented to the

---

[2] Rule 608(b) provides in pertinent part: "Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence."

trial court. In his motion for a new trial, Leach argued that the trial court's exclusion of Dr. Mount's testimony violated Leach's rights to confrontation, to a fair trial before an impartial jury, and to due process. As a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal. Johnson v. State, 38 S.W.3d 52, 60 n.8 (Tenn. 2001). We hold that the issue of whether Dr. Mount's testimony was admissible under Rules 613 and 616 is waived because Leach did not raise it in the trial court or in his motion for a new trial. See Tenn. R. App. P. 3(e), 36(a).

Moreover, we conclude that Leach would not be entitled to relief even if the issue had been properly preserved. Leach argues that Dr. Mount's testimony was admissible under Rule 613(b) as evidence of prior inconsistent statements by Walker and under Rule 616 as evidence of Walker's prejudice against Leach. The State responds that the inconsistent statements were not admissible as extrinsic evidence under Rule 613 because they related to collateral facts and that Dr. Mount's testimony failed to establish bias or prejudice within the meaning of Rule 616. At the time of Leach's trial, Rule 613(b) provided: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."[3] Rule 616 states: "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." We agree with the State's position.

Under the collateral fact rule, the statement of a witness made during cross-examination as to a collateral fact may not be impeached by extrinsic evidence of a prior inconsistent statement as to that fact. See State v. Hill, 598 S.W.2d 815, 820 (Tenn. Crim. App. 1980); see generally Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence § 6.13[6] (4th ed. 2000). A collateral fact is one which affords no reasonable inference as to the principal matters in dispute. Saunders v. City & Suburban R. Co., 41 S.W. 1031, 1034 (1897). A fact is collateral for purposes of the collateral fact rule if it is relevant only because it contradicts something said in court; it is not collateral if it is relevant independent of any contradiction. See Tennessee Law of Evidence at § 6.07[4][c].

Prior to the enactment of the Rules of Evidence, the collateral fact rule was an established part of the common law in Tennessee. See, e.g., State v. Rogers, 703 S.W.2d 166, 170 (Tenn. Crim. App. 1985); State v. Marlow, 665 S.W.2d 410, 412 (Tenn. Crim. App. 1983). This rule of evidence was founded upon the just conclusion that the introduction of such evidence tends to confuse the jury and uselessly to protract and increase the expense of judicial investigations. Decherd v. Morrison, 32 Tenn. 305, 306-07 (1852). Although the Rules of Evidence do not mention the collateral fact rule, it continues to be applied by courts in this state. See, e.g., State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992).

---

[3] Rule 613(b) was amended in 2003 to add the phrase "and until," making the rule clearly indicate that extrinsic evidence of the prior statement is inadmissible "unless and until" the witness is afforded an opportunity to explain or deny it. The amendment does not affect the analysis in this case.

The collateral fact rule is essentially a rule of relevancy. Under Rule 402 of the Tennessee Rules of Evidence, "[e]vidence which is not relevant is not admissible." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Rules 402 and 403 embody the principles underlying the collateral fact rule. We conclude, therefore, that the collateral fact rule remains viable through Rules 402 and 403.

As with any type of proof, admissibility of extrinsic evidence depends on relevancy. Impeachment by extrinsic evidence as contemplated by Rule 613 must relate to facts relevant to a material issue at trial. Allowing the introduction of extrinsic evidence for the purpose of contradicting a witness's testimony about merely trivial facts would not only waste time but could also confuse the jury. The motive of a witness, however, is always relevant to the main issue. See Creeping Bear v. State, 87 S.W. 653, 654 (1905). Therefore, extrinsic evidence that is inadmissible for other purposes may be admissible to prove bias or prejudice under Rule 616.

In this case, Walker's inconsistent statements involved collateral facts. Proof that Walker lied to mental health evaluators about his criminal record and personal information would not have been relevant to a material issue at trial. Walker was thoroughly cross-examined about his criminal record and motive for testifying. Proof that Walker was evasive and manipulative during his mental health evaluation would also have had little probative value in showing that he was biased in favor of the State or prejudiced against Leach. As the Court of Criminal Appeals observed, introduction of Dr. Mount's testimony would have resulted in a mini-trial concerning Walker's actions during his mental health evaluation and potentially confused the issues of Leach's capital murder trial. We conclude, therefore, that the trial court properly excluded the evidence under Rule 403, regardless of the theory of admissibility. Finally, we conclude that any error would be harmless because, assuming Dr. Mount had discredited Walker's testimony, the remaining evidence was sufficient to support the convictions.

### Instruction Regarding Evidence of Attack on Dorianne Brown

The trial court admitted evidence of Leach's attack on Dorianne Brown at the Econo Lodge under Rule 404(b) of the Tennessee Rules of Evidence to show motive. Leach did not object to admission of the evidence on this ground. At the jury charge conference, however, the State requested the trial court to instruct the jury that it could consider this evidence not only to show motive but also to provide "the complete story of the crime." The trial court agreed and charged the jury as follows:

> If from the proof you find that the defendant has committed a crime
> other than that for which he is on trial, you may not consider such

evidence to prove his disposition to commit such a crime as that on trial.

This evidence may only be considered by you for the limited purpose of determining whether it provides:

(a) the complete story of the crime; that is, such evidence may be considered by you where the prior crime and the present alleged crime are logically related or connected, so that proof of the other tends, or is necessary to prove the one charged, or is necessary for a complete account thereof.

(b) motive; that is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged.

Such evidence of the other crime, if considered by you for any purpose, must not be considered for any purpose other than that, specifically, stated.

On appeal, the Court of Criminal Appeals held that the trial court erred in not conducting a jury-out hearing as required by State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000), to determine whether the evidence was admissible to show contextual background. In addition, the Court of Criminal Appeals held that the evidence in question was not properly admitted as contextual background evidence under Gilliland. The Court of Criminal Appeals concluded, however, that the error was harmless because the evidence was admissible to prove motive. In this Court, Leach submits that admission of the evidence on another ground did not render harmless the trial court's instruction that the evidence could be used for the purpose of providing "the complete story of the crime." Leach contends that this instruction invited the jury to consider the attack on Brown as establishing Leach's propensity to commit the crimes in this case, in violation of this Court's holding in State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985).

In Gilliland, the Court set forth the following standard for determining when background evidence involving other crimes, wrongs or acts may be offered "for other purposes" under Rule 404(b):

[W]hen the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the

13

> probative value of the evidence is not outweighed by the danger of
> unfair prejudice.

Id. at 272 (emphasis added). By its own terms, this standard is limited to "evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case." Id. (emphasis added). The State did not offer evidence of the attack on Brown as contextual background for the case. The evidence was offered and properly admitted to show motive, a material issue in the case. Therefore, no error occurred relative to admission of this evidence.

The trial court properly instructed the jury that the evidence could be considered for the limited purpose of determining whether it tends to show a motive. Evidence proving motive necessarily serves the purpose of completing the story of the crime. Therefore, the portion of the instruction allowing the evidence to be considered for the purpose of providing "the complete story of the crime" was superfluous. Moreover, contrary to Leach's assertion, the instruction did not invite the jury to consider the attack on Brown as propensity evidence. In determining whether instructions are erroneous, this Court must review the charge in its entirety and read it as a whole. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). The instruction regarding the use of this evidence specifically directed the jury that it "may not consider such evidence to prove [Leach's] disposition to commit such a crime as that on trial." The jury is presumed to have followed this instruction. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). We therefore conclude that, viewed as a whole, the instruction regarding evidence of the attack on Brown was not erroneous.

### Failure to Charge Aggravating Circumstances in Indictment

Leach contends that Apprendi v. New Jersey, 530 U.S. 466 (2000); Rule 12.3(b) of the Tennessee Rules of Criminal Procedure; Article I, section 9 of the Tennessee Constitution; and Tennessee Code Annotated section 40-13-202 require that an indictment for capital murder reflect that the grand jury found the existence of one or more statutory aggravating circumstances. Leach acknowledges that we rejected this argument in State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002), but asks that we reconsider our ruling in Dellinger. We addressed this issue in detail in our recent decision in State v. Berry, __ S.W.3d __ (Tenn. 2004). We noted that our statement in Dellinger that "[t]he death penalty is within the statutory range of punishment prescribed by the legislature for first degree murder," 79 S.W.3d at 466, is not entirely accurate in light of Ring v. Arizona, 536 U.S. 584 (2002), and Blakely v. Washington, 124 S.Ct. 2531 (2004), both of which were decided after Dellinger. See Berry, __ S.W.3d at __ n.14. We concluded, however, that Ring and Blakely do not affect our ruling in Dellinger that the State is not required to charge aggravating circumstances in the indictment. For the reasons stated in Berry, we hold that no error occurred in this case.

### Mandatory Review

We are bound by statute to review the application of the death penalty to determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;

14

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (1997). Having thoroughly reviewed the record, we find no indication that the sentence of death was imposed in an arbitrary fashion. We also conclude that the State presented sufficient proof to uphold the jury's finding that Leach had prior convictions for felonies whose statutory elements involve the use of violence to the person, see Tenn. Code Ann. § 39-13-204(i)(2) (1997), that the murders in this case were especially heinous, atrocious, or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death, see Tenn. Code Ann. § 39-13-204(i)(5) (1997), that the murders in this case were knowingly committed by Leach while he had a substantial role in committing or attempting to commit robbery or aggravated rape, see Tenn. Code Ann. § 39-13-204(i)(7) (1997), and that victim Jean Poteet was seventy years of age or older or was particularly vulnerable due to a significant handicap or significant disability, whether mental or physical, and at the time of the murder Leach knew or reasonably should have known of such handicap or disability, see Tenn. Code Ann. § 39-13-204(i)(14) (Supp. 1998). We further hold that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

Next, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D) (1997). We are mindful of the following principles applicable to proportionality review:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been previously imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

15

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in identifying and comparing similar cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. See Bland, 958 S.W.2d at 667. In comparing defendants, we consider the following non-exclusive factors: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. See id.

The proof in this case showed that Leach brutally beat, stabbed, and strangled two elderly women. He raped one victim, sixty-nine-year-old widow Sarah McBride, as she was dying. The other victim, seventy-year-old Jean Poteet, was both mentally and physically disabled. The murders were committed during a robbery at McBride's home and were motivated by Leach's desire to obtain the means for fleeing Nashville and to prevent the victims from alerting the police. The evidence also indicated that Leach had always had a fantasy of committing multiples rapes and homicides. The murders were premeditated, unprovoked, and unjustified.

Leach, a white male, was thirty-seven years old at the time of the murders and had a prior criminal history including convictions for aggravated assault, robbery, and burglary. He cooperated minimally with authorities and expressed horror, but no remorse, about the murders. Leach presented mitigating evidence that he suffered from low self-esteem, depression, and suicidal tendencies. He was neglected and tormented as a child. He claimed to have been physically and sexually abused, starting from childhood and continuing into his adult years in prison. Despite these problems, Leach experienced periods of relative calm in his life when he was gainfully employed.

Based upon an exhaustive review of the record and Supreme Court Rule 12 reports, we conclude that the sentences of death imposed in this case are not excessive or disproportionate when compared to the penalty imposed in similar cases. See State v. Mann, 959 S.W.2d 503 (Tenn. 1997) (defendant raped and murdered sixty-two-year-old widow during burglary, death sentence upheld based upon (i)(5) and (i)(7) aggravating circumstances); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (defendant murdered seventy-nine-year-old widow, death sentence upheld based upon (i)(5) and (i)(6) aggravators); State v. Smith, 893 S.W.2d 908 (Tenn. 1994) (defendant raped and murdered elderly widow, death sentence upheld based upon (i)(2), (i)(5), and (i)(7) aggravators); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994) (defendant raped and murdered elderly woman, death sentence upheld based upon (i)(2), (i)(5), and (i)(7) aggravators); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (defendant murdered elderly woman, death sentence upheld based upon (i)(5) aggravator); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (defendant murdered seventy-two-year-old widow, death sentence upheld based upon (i)(5) aggravator); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (defendant murdered sixty-two-year-old woman, death sentence upheld based upon (i)(5) aggravator); and State v. Cone, 665 S.W.2d 87 (Tenn. 1984) (defendant murdered elderly couple, death sentence upheld based upon (i)(2), (i)(5), and (i)(6) aggravators). Leach contends that, despite the horrible nature of the crimes he committed, the sentences of death are disproportionate in this case given the history of abuse he suffered. He argues that a jury imposed a life sentence in a similar

case where the defendant had a less extensive history of abuse, citing State v. J. Y. Sepulveda, 1997 WL 351107 (Tenn. Crim. App., June 26, 1997).[4] We reiterate, however, that our analysis does not require a determination of whether a given case is subjectively "more or less" like other "death" cases or other "life" cases. Davidson, 121 S.W.3d at 623 (citation omitted). Instead, our review requires that we identify an aberrant death sentence by determining whether the case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty previously was imposed. Id. After reviewing the cases discussed above, and many others not specifically cited, we are of the opinion that the sentences of death in this case are not excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentences of death have not been imposed arbitrarily, that the evidence supports the jury's finding that the statutory aggravating circumstances have been proven by the State beyond a reasonable doubt, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate.

We have reviewed all of the issues raised by Leach and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. Leach's convictions and sentences are affirmed. We note, however, that the judgment for the especially aggravated robbery conviction in Count 5 incorrectly refers to Count 6, and the judgment for the aggravated rape conviction in Count 6 incorrectly refers to Count 5. The case is remanded to the trial court for correction of these clerical errors. The sentences of death shall be carried out as provided by law on the 12 th day of April, 2005, unless otherwise ordered by this Court or other proper authority. It appearing that defendant Robert L. Leach, Jr., is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

---

[4]In Sepulveda, the nineteen-year-old defendant murdered his ninety-five-year-old neighbor by beating and kicking her during a burglary of her home. Sepulveda is distinguishable from the present case. Sepulveda had a long history of significant drug problems; he did not use a weapon on his victim, and his victim survived the attack for several weeks.

17