IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 10, 2018

## STATE OF TENNESSEE v. MARTRICE THOMAS

**Appeal from the Criminal Court for Shelby County**
No. 15-03428          Chris Craft, Judge

_____

### No. W2017-02489-CCA-R3-CD

_____

On September 21, 2017, the Defendant, Martrice Thomas, was convicted of first-degree premeditated murder. The trial court sentenced her to life imprisonment in the Department of Correction. The Defendant argues on appeal that the evidence is insufficient to sustain her conviction. After thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Larry E. Fitzgerald (on appeal) and Joseph R. Taggart (at trial), Memphis, Tennessee, for the appellant, Martrice Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jeff Jones and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On July 16, 2015, a Shelby County grand jury indicted the Defendant for the first-degree premeditated murder of her boyfriend, Willie Harris. Following a jury trial, the Defendant was convicted on September 21, 2017. We now review the facts relevant to this appeal.

The Defendant and the victim began dating in late December 2014, and the victim moved into the Defendant's home a month later. The Defendant and the victim had repeated physical and verbal arguments during their relationship, and on February 16, 2015, the victim recorded the Defendant during one of their arguments. On the recording, she threatened, "I'm going to kill [the victim], because he playing in my motherf****** house with him and his n*****s and he gave another b**** something for Valentine's Day. I'm going to kill [the victim]. I own a .38 and a .40." The next day, February 17, 2015, the Defendant shot and killed the victim.

At trial, Eddie Harris testified that the victim had told him days before the shooting that the Defendant had "found a receipt . . . that he bought his ex-girlfriend something for Valentine's Day." Mr. Harris stated that he went to the Defendant's house on February 17, 2015, to help the victim and his disabled uncle move out of the home. Another friend, Eddie Niles, arrived approximately fifteen minutes later to help with the move. The Defendant had gone to the bank to withdraw money that she owed the victim, and he, Mr. Harris, and Mr. Niles smoked marijuana while awaiting her return. Mr. Harris testified that the Defendant returned without the money, saying that the bank was closed and the ATM was broken. The victim and the Defendant then fought about the money, and Mr. Harris placed himself "in-between them because [he] knew [the Defendant] had them [sic] guns." The victim took the Defendant's car keys and said he would return them when she gave him the money, though Mr. Harris testified that the victim would have given the keys back if asked. During the argument, Mr. Harris tried to offer solutions.

Mr. Harris testified that the victim then picked up the dog he shared with the Defendant, threw it against the wall, and "started stomping the dog." The Defendant then asked Mr. Harris to go to the bank with her and then went into her bedroom. Mr. Harris and the victim then relaxed on the couch while Mr. Niles stood by the front door, as the Defendant did not want him in her home. While Mr. Harris and the victim were sitting on the couch, the Defendant suddenly came out of her bedroom and said "some s*** like, 'You got me f***** up'" while pointing a gun at the victim. Mr. Harris and the victim "jumped up" from the couch, and Mr. Harris repeatedly said to the Defendant, "You can't do that." As Mr. Niles made a move to get the gun away from the Defendant and Mr. Harris tried to "ease up on her," the Defendant fired the gun, striking the victim. Mr. Harris stated that the victim fell as he was shot, and he then got up and ran outside as the Defendant fired a second shot.

After the second shot, the Defendant asked, "Where the other mother****** at?" and Mr. Niles ran past the Defendant, following the victim outside. Mr. Harris was then able to take the gun out of the Defendant's hands and tell Mr. Niles to call 911. Mr. Harris testified that he then demanded the Defendant tell him where her other gun was

hidden, because he "knew she had two guns." While he was looking for the second gun, Mr. Niles told Mr. Harris that he had located the victim, and Mr. Harris testified that they found the victim lying face down in the street. Mr. Harris and Mr. Niles then drove the victim to the hospital, where he later died from the gunshot, which had penetrated his lungs and spine. Mr. Harris testified that Mr. Niles, the victim, and he were unarmed, though he asserted he would have used a gun for self-defense if he had had one. He further stated that he had never seen the Defendant and the victim get into a physical altercation.

Mr. Niles' testimony at trial largely echoed that of Mr. Harris. He stated that he went to the Defendant's house on February 17, 2015, to help the victim move out of the house and "to prevent anything from happening, arguing, or fighting, anything like that." He reiterated that after the Defendant returned without the money, she and the victim fought, he threw the dog against the wall, and he took her keys. The Defendant then stated that she would go back to the bank, went into her bedroom, and then emerged with a gun. Mr. Niles testified that the Defendant also said, "B*****, I told you I wasn't nothing to play with[,]" before pointing the gun at the victim. The Defendant stood approximately fifteen to twenty feet from the victim as she aimed the gun at him, and Mr. Niles tried to grab the gun away from her when she fired the first shot. The Defendant repeated "[Y]eah I told you" and stepped forward to fire the second shot, giving Mr. Niles the opportunity to run past her and hide in another room. Mr. Niles testified that the Defendant shouted, "Where the other mother****** at?" and knew that she was referring to him. In response, Mr. Niles testified that he became afraid and barricaded himself in the room where he was hiding by "slid[ing] the couch behind the door," and he "threw [his] hoodie on [his] head and tied it up around [his] face" because he was "going to dive out the [closed] window" if the Defendant tried to get into the room.

Mr. Niles testified that when he heard Mr. Harris yelling from the hallway, he ran outside and saw the victim face down in the street. Mr. Niles stated that when he got to the victim, his "hands was [sic] locked up and he was looking at [Mr. Niles] trying to talk and he was just [gasping for air]." Mr. Niles then went back into the house to tell Mr. Harris, who was searching for the Defendant's other gun, that they needed to get help for the victim. When he went back into the house, Mr. Harris had the Defendant "pinned on the couch" and Mr. Niles took the gun away from her and put it in his pocket. Mr. Niles called 911, and Mr. Harris and the victim's cousin and neighbor Frank helped him place the victim in Mr. Harris' car. Mr. Niles testified that the Defendant had grabbed her other gun, and she told Mr. Niles he needed to return the gun he had taken from her. The Defendant had called 911, and police officers arrived as they were taking the victim to the hospital. Mr. Niles testified that he had never seen a physical altercation between the Defendant and the victim.

Dr. Paul Benson, the forensic pathologist who performed the victim's autopsy, testified as an expert witness. He affirmed that the bullet entered the victim's lower left side and lodged behind his right shoulder, hitting the left lung, spine, and right lung before stopping. Dr. Benson testified that he was unable to tell how far away the Defendant was from the victim when she shot him and stated that it was not close range, but from a distance of an "indeterminate range . . . [s]ome people call it distant range." He testified that this wound would have, "by perforating both of the lungs, caused bleeding into both sides of the chest inbetween [sic] the lung and the chest wall" and been fatal due to the victim's "bleeding out into the chest cavity from the wound."

Officer William Lane of the Memphis Police Department testified that he responded to reports of a shooting at the Defendant's home on February 17, 2015. When he arrived, the Defendant "started saying something along the lines of – it was self-defense." Officer Lane's partner, Officer Hilton, then placed the Defendant in their squad car, and they secured the scene and waited for detectives to arrive.

Officer David Payment of the Memphis Police Department testified at trial that he was one of the Crime Scene Investigators assigned to investigate the shooting. He first responded to the hospital where the victim was taken to photograph the victim and the car he was transported there in. Officer Payment testified that he did not find any weapons or other evidence in the car, with the exception of what appeared to be blood stains. Officer Payment then went to the Defendant's home to process the crime scene. He testified that he found the Defendant's two guns on the couch, two spent bullet casings, and more unused bullets on the bed in the bedroom. Officer Payment then went to the Homicide office to photograph the Defendant, based on her assertion of self-defense. The Defendant told Officer Payment where on her body she was injured, and he testified that he observed bruises on the Defendant's arms, "slight subcutaneous bruising" on her neck with the aid of an alternative light source, and no bruising on her face.

The Defendant testified on her own behalf at trial. She stated that her relationship with the victim became abusive around January 26, 2015. She affirmed that she had threatened to kill the victim on the recording he had made of her. She denied that she owed the victim any money and instead asserted that he felt she owed him money because she had asked him to move out of her home. She stated that on February 16, 2015, they agreed that he would move out if she paid him $2000. The Defendant testified that the next morning, the victim "slammed [her] head into the wall . . . several times." She asserted that the victim, Mr. Harris, and Mr. Niles all had guns when she got home from the bank on February 17, 2015, though she did not know what happened to them.

After the victim threw their dog into the wall, the Defendant testified that she "tr[ied] to make a run for it[,]" but was blocked by Mr. Niles standing by the front door

- 4 -

with a gun.  The Defendant also testified that the victim "charged at [her]" and she "reacted and [she] shot, because [she] was afraid."  She further asserted that "[w]hen he charged towards [her], [she] took [the gun] out of her purse" and "fired the gun [while] [the victim] was still standing there."  She explained that she fired two shots because she "was trying to just scare [the victim] into stopping him from charging at [her]."  The Defendant testified that she never threatened Mr. Harris or Mr. Niles.

On cross-examination, the Defendant testified that she had been on medical leave from her employment for approximately a year and had just filed for bankruptcy when she moved into her home in January 2015.  The victim moved into the home soon after.  The Defendant testified that the victim "wasn't welcome" to sleep in her bedroom "most of the time, because of the arguing and bickering."  She stated that Mr. Niles "was not welcome in [her] house" because he "kept introducing [the victim] to other women[.]"  The Defendant affirmed that the victim had sold his vehicle, furniture, and "some other stuff" prior to moving in with her, and was to give her money out of his disabled uncle's disability check every month.  She testified that the victim had "put his hands on [her] about four times[,]" and though she called the police after one of those incidents, the victim was never arrested.

The Defendant further testified that she did not owe the victim money, though the State played back the recording that the victim had made of her the day before the shooting, in which she stated that she owed him $1600.  She testified that the victim had given an ex-girlfriend a gift for Valentine's Day, and she affirmed that "in the first . . . thirty seconds" of the recording, she said four times that she "[was] going to kill [the victim]."  Later in the recording, the Defendant and the victim also discussed his selling the Xanax pills she had been prescribed, and the Defendant said, "I gave you a whole bottle of pills and I ain't seen nothing, a bottle of pills and I haven't seen but god**** $65.00 from it[.]"  The Defendant maintained that despite her statement on the recording, she was "not selling [the pills] for profit[.]"  She could also be heard saying "I want you to hit me" multiple times during the recording.

The Defendant further stated that the victim "punched her in the face" multiple times on the morning of the shooting.  She testified that she was "easy to bruise" and had received at least one of the bruises on her arms from a man named "Montana."  Although the Defendant asserted that all three men had guns at the time of the shooting, she conceded that she did not mention their guns in her call to 911 or her police report, instead only mentioning to 911 that she wanted to report the gun that Mr. Niles and Mr. Harris had taken away from her as "stolen."

On redirect examination, the Defendant stated that the victim was the only one who could have caused the bruises found on her body.  On recross examination, the

Defendant stated that some of the bruises "could have been" caused by "Montana." She maintained that she had bruising to her face, even after affirming that Officer Payment had not observed any bruising to her face, and she had not told him that there might be bruising to her face.

Following the close of all proof, the Defendant was found guilty of first-degree premeditated murder and sentenced to life imprisonment.

## ANALYSIS

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d

776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

To sustain the first-degree murder conviction, the State had to prove beyond a reasonable doubt that the Defendant committed a first-degree premeditated and intentional killing of the victim. See Tenn. Code Ann. § 39-13-202(a)(1). As defined by statute:

> "Premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed factors that support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon; preparations to conceal the crime and destruction or secretion of evidence of the killing; and the defendant's calmness

immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence shows that the Defendant threatened to kill the victim on the night before the shooting and then killed him the next day. Evidence suggested that the victim bought a gift for his ex-girlfriend, angering the Defendant. Though she testified that the victim, Mr. Niles, and Mr. Harris had guns on the day of the shooting, Mr. Niles and Mr. Harris testified that they were unarmed, and police found no weapons other than those belonging to the Defendant. The Defendant asserted that she shot the victim in self-defense. However, other than her own testimony, there is little evidence to support such an assertion. Although she had bruises on her arms and neck, the victim stated that at least one of the bruises came from another man. Further, although the Defendant stated that the victim had punched her in the face and thrown her head-first into a wall on the morning of the shooting, there was no bruising to her face, and she did not make such an assertion until trial. The Defendant also testified that she only shot the victim when he "charged at" her. However, the testimony of two eyewitnesses and the forensic pathologist contradict such a version of events. Instead, the evidence suggests that the Defendant shot the victim from a distance. After the shooting, the Defendant also desired to report to 911 that the gun she had used to shoot the victim had been stolen. Therefore, several of the above factors fit the circumstances surrounding the victim's murder, and such circumstances accordingly support the inference of premeditation. See Jackson, 173 S.W.3d at 409; Thacker, 164 S.W.3d at 222; Leach, 148 S.W.3d at 54; Nichols, 24 S.W.3d at 302; Bland, 958 S.W.2d at 660. As we previously stated, whether premeditation exists is a question of fact to be determined by the jury. Although the Defendant argues that she did not intend to kill the victim, but instead acted in self-defense, the jury obviously discredited this assertion. Based on the foregoing, we conclude the evidence is sufficient for a rational trier of fact to infer that the Defendant premeditated the killing.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

- 8 -