IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 12, 2006

## STATE OF TENNESSEE v. GEORGE ROBERT WAGGONER

**Appeal from the Circuit Court for Dekalb County**
**No. 04-117     Lillie Ann Sells, Judge**

---

**No. M2006-00553-CCA-R3-CD - Filed May 8, 2007**

---

The defendant, George Robert Waggoner, was convicted by a DeKalb County jury of two counts of premeditated murder, two counts of murder committed during the perpetration of a theft of property valued at over one thousand dollars, and one count of theft of property valued at over one thousand dollars, a Class D felony, involving the deaths of his grandparents. The premeditated murder and felony murder counts merged, and the trial court imposed two consecutive life sentences for the murder convictions concurrent with a three year sentence, as a Range I, standard offender, for the theft conviction. The defendant now appeals, claiming the trial court erred in admitting prior bad acts committed by the defendant, in admitting photographs of the deceased victims taken at the crime scene, and in imposing consecutive life sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

A. Vester Parsley, Jr., and Jeremy D. Trapp, Smithville, Tennessee, for appellant, George Robert Waggoner.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Gibson, District Attorney General; and William Locke, Assistant District Attorney General, for appellee, State of Tennessee.

## OPINION

On March 1, 2004, the bodies of Fred and Ruth Pelham were discovered after two of their children asked a neighbor to check on them following repeated attempts to contact them by telephone. Authorities determined that each victim had died from a single gunshot wound to the head. The defendant, who is also the victims' grandson, became a suspect when it was learned that several guns were missing from the victims' home and that the defendant had been selling guns in exchange for money and drugs. The defendant was indicted for two counts of premeditated murder, two counts of felony murder, and one count of theft of property valued at over one thousand dollars.

Captain Mark Collins of the DeKalb County Sheriff's Department testified that he investigated both the victims' murders and an incident that occurred on January 5, 2004, less than two months prior to the murders, involving the burglary of their home and theft of guns. Regarding the January 5 thefts, Captain Collins stated that after one of his deputies made the initial report and ran the guns through the NCIC database, they discovered that the guns had been pawned at a local pawn shop. The deputy retrieved the guns from the pawn shop and learned that they had been pawned by the defendant. Captain Collins assisted in the arrests of the defendant and his brother, Glen Waggoner, for the burglary and theft. After booking, the defendant advised an officer that he wanted to speak with Captain Collins because he wanted to make a deal on the charges. The defendant confessed to the burglary and theft and told Captain Collins that he pawned the guns to buy drugs from his uncle, Harold Waggoner. The defendant acted as a confidential informant and took part in an undercover drug buy from his uncle, which led to his uncle's conviction and incarceration for drug offenses. Captain Collins testified that one of the stolen guns, a .12 gauge Beretta shotgun that was recovered and returned to Mr. Pelham, was found later in an outbuilding four or five miles from the Pelham residence after having been stolen again from the murder scene on February 29, 2004.

Captain Collins testified that he was called to the Pelham residence on February 29, after a neighbor found Mrs. Pelham shot in the living room. Through the investigation, Mr. Pelham's body was discovered underneath a tarp beside a shed outside. Captain Collins testified that an individual named Dennis Ellis led them to the outbuilding where the stolen guns were found. In addition to the Beretta shotgun previously mentioned, Captain Collins stated that three other guns, a .20 gauge Beretta shotgun, a Benelli .300 caliber rifle and a Browning automatic .270 caliber rifle, were all recovered at the shed a few miles from the Pelham residence. Additionally, authorities recovered a Charles Daley .12 gauge shotgun that had been sold to an individual after being stolen from the Pelham residence. Investigators recovered all of the guns within days of the murder. Captain Collins, an avid gun collector, stated that the five recovered guns would have a value of more than a thousand dollars.

On cross-examination, Captain Collins recounted that the defendant was involved in the controlled drug purchase from Harold Waggoner after the January 5 thefts. He further recalled that Harold Waggoner was arrested within hours of the controlled buy's occurrence. He stated that Harold Waggoner knew the defendant had turned him in because the defendant had told him that he

had done so. Captain Collins stated that Dennis Ellis provided the defendant with Dilaudid and morphine in exchange for the guns; however, he was never charged with any offenses related to the investigation.

Brady Rochefort, the thirteen-year-old great-grandson of the victims, testified that he had spent the night at the victims' home on February 28, 2004. He identified the defendant and recalled that the defendant had been to the victims' home around 3:00 p.m. on February 29. He recounted a discussion between the defendant and Mrs. Pelham wherein the defendant denied involvement in any burglary of the home, and Mrs. Pelham told the defendant that she thought he was responsible. Rochefort stated that Mr. Pelham did not speak to the defendant and that the conversation only lasted about five minutes before the defendant left the home to return to his mother's home next door. Rochefort testified that his mother picked him up around 6:00 p.m. While they were leaving, Rochefort noticed that the light in Mr. Pelham's truck was on, so he went inside to tell him. He stated that Mr. Pelham said he would go out later to turn it off. He reiterated that the afternoon visit was the only time he had seen the defendant at the house and that neither victim wrote the defendant a check during that time. Rochefort also recognized one of the recovered guns because he had been with his grandfather just a few weeks before the murders when he purchased it at a local gun shop.

Amber Rochefort, Brady's mother and the victims' granddaughter, corroborated the testimony of her son, Brady. She also identified several of the guns recovered as belonging to her grandfather. Jonathan Lewis, another of the victims' grandsons, also identified all of the guns as belonging to his grandfather.

Ray Judge, a local gun shop owner, testified that Mr. Pelham had bought the Daley shotgun from him on February 13, 2004, just weeks before the murders occurred. He estimated the total value of the stolen guns to be approximately $5,500.00.

Helen Lowery, one of the victims' daughters, testified that the defendant and his mother lived next door to the victims when the murders occurred. She stated that she had attempted to telephone her parents at approximately 7:00 p.m. on February 29, because they were planning a trip to McMinnville on Monday morning, March 1. She said that she called every thirty minutes until about 10:00 p.m. but never got an answer. She stopped calling at 10:00 p.m. because the victims usually went to bed by that time. She thought it unusual that they did not answer the phone because they never went out at night but thought that maybe one of her parents was not feeling well or that her mother might have been on the internet. She said that her sister, Brenda, ended up taking her to her appointment in McMinnville. When Brenda mentioned that she also had been unable to reach their parents on the phone, they both became concerned. They went by their parents' house and Lowery noticed immediately that the victims' truck was not parked as it usually would be. After being unable to get either parent to answer the door, the sisters called a neighbor, Rick Amburgey, to assist them. The neighbor was able to break into the front door and, upon entering the home, immediately stepped back out and told Lowery to promise not to go inside while he went to call the police. Lowery was there when the police arrived and when they found her father's body by the shed outside. Her mother was found dead in her recliner. Both were victims of gunshot wounds to the

head.  She recalled that the defendant had called her early on the morning of March 1 and asked her for money.  She said she never gave him any money because of the events of later that day.  She was aware he had stolen guns from the victims in January.

Rick Amburgey testified that he lived across the street from the victims and that the defendant and his mother lived next door to the victims.  He recalled seeing the defendant walking through the woods on the afternoon of February 29 and, later in the afternoon, he saw the defendant and Mr. Pelham talking outside.  Amburgey stated that he left his home a little after 6:00 p.m. to go eat.  He remembered hearing a gunshot from the area of the victims' home but he figured that Mr. Pelham was outside shooting his guns.  He looked at the Pelham residence on his way to dinner and noticed that no one was outside and that the truck was gone. He could not recall seeing any vehicles in the victims' driveway when he returned home from dinner on the evening of February 29.  He testified that the victims' daughters asked him for help getting into the residence on March 1.  When he was able to open the door, Amburgey noticed the victims' dog was covered in blood and looked up to see Mrs. Pelham dead in her recliner.  He immediately closed the door, told the daughters not to go inside and called the police.  He stated that he did not see Mr.Pelham and was concerned for his whereabouts.

Fred Robert Pelham, the victims' son, testified that he received a call that his parents had been killed and traveled to their home.  He said that he immediately noticed that his parents' truck was parked in an unusual manner.  He had no doubt that his mother had not parked it and that it had last been driven by someone other than her.

Glen Edge testified that he was a neighbor of William Ray Cantrell.  He recalled that on the evening of February 29, he had returned home from dinner and grocery shopping with his family to find a dark green truck parked in his driveway.  Cantrell was standing outside the driver's door talking to the driver.  The truck pulled ahead so that Edge could park.  After taking his groceries inside, he walked back out to his car for his cigarettes and saw the defendant standing near the green truck.  He later identified the defendant out of a photographic line-up as the driver of the green truck.

William Ray Cantrell testified that he had a drug problem in February 2004.  He stated that he knew the defendant and that they had used drugs together.  He stated that, after acting as a confidential informant against his uncle, the defendant could no longer get drugs on his own so Cantrell would obtain them for him.  He recalled that the defendant called him around 6:00 or 7:00 p.m. on February 29 and wanted to know if he "could get rid of some guns."  Cantrell contacted Dennis Ellis and Shannon Newby about the guns.  He stated that the defendant arrived at his neighbor's driveway at about 7:00 p.m. in a green Chevrolet truck.  He said that the defendant showed him the guns and they later drove toward Ellis' house to show the guns to Ellis and Newby. He described the defendant as acting normal and said he did not suspect anything.  Cantrell said that he drove the truck to Ellis' house while the defendant stayed behind because no one would deal with him after the confidential informant episode.  Cantrell said he had a pretty good idea the guns were stolen.  He said that Newby traded four of the guns for eight Dilaudid tablets.  Cantrell and the defendant split the pills and injected them on their way home.  With Cantrell's assistance, the

defendant was able to trade the last gun to David Arendall in exchange for two morphine pills. On March 1 at around 9:30 a.m., the defendant arrived at Cantrell's home with an eighty dollar check written on his grandparents' account. They cashed the check at the VFW and purchased two Dilaudid pills with the eighty dollars. While at Cantrell's home, the defendant talked to someone on the telephone and, when he hung up the phone, told Cantrell that someone had shot his grandfather. Cantrell said the defendant really did not act upset about hearing of his grandfather's death.

Shannon Newby testified that he has suffered from a long-term addiction to Dilaudid and morphine since a car accident in 1995. At the time of trial, Newby was incarcerated for two aggravated burglaries and related thefts. Newby identified the victims' truck as the one driven by Cantrell on February 29, the night he traded eight Dilaudid for four guns. He said that when the police called him in for questioning on March 1, the guns were hidden under his bed but that his brother, Dennis Ellis, hid them somewhere else while he was being questioned. He was not charged with possession of the stolen guns. He did not see the defendant on the night Cantrell brought the guns to his house and stated that he would not have dealt with the defendant because of his reputation for turning on his uncle as well as the fact that he just did not know the defendant that well.

Dennis Ellis testified that he has a history of drug convictions. He related the same events regarding the exchange of the guns for the Dilaudid pills. He stated that he wiped the four guns and wrapped them in blankets when he took them to an abandoned house to store in an effort to save his brother, Newby, from any trouble related to the stolen guns. He cooperated with the investigators in retrieving the guns so he would not be charged as an accessory to murder.

William David Arendall testified that Cantrell came to his house around 10:00 p.m. on February 29 and asked him to keep a gun for him because his sister would not let him keep it at her house. He denied trading drugs for the gun. He turned the gun over to the police on Tuesday, March 2. On cross-examination, he acknowledged that he had a prescription for morphine but denied ever selling any drugs to anyone.

Special Agent Bob Krofssik of the Tennessee Bureau of Investigation testified that he was called to the Pelham residence in the early afternoon of March 1 where he observed Mr. Pelham's body near a shed and Mrs. Pelham's body in her recliner. He observed several shotgun shells around Mr. Pelham's body but stated that Mrs. Pelham appeared to have suffered a single shotgun wound to her head. He also recalled that Mrs. Pelham's purse was on the floor near the recliner where she lay. A videotape of the scene was shown to the jury while Agent Krofssik described the blood spatter evidence throughout the living room. He stated that the rest of the house was in a normal condition and that the rooms did not appear to have been ransacked, stating the house "appeared normal other than the fact that we had two dead persons at that residence." Keys to the truck were found in the backyard about thirty-five to forty feet away from the house. An examination of Mr. Pelham's body revealed that he suffered a gunshot wound to the back of the head. The investigation further revealed that one check was missing from the Pelhams' checkbook.

The defendant became a suspect early in the investigation because of the January burglary and theft, so Agent Krofssik interviewed the defendant on March 2 after the defendant was properly advised of his rights and signed a waiver of rights. In his statement, the defendant denied any knowledge of the murders or the theft of guns. The defendant claimed to be with Cantrell most of the evening of February 29. He told the investigators that his grandfather had been angry with him over the January 5 incident but had since forgiven him and was assisting him with his drug problem.

TBI Special Agent David Hoover, who was stipulated as an expert in latent fingerprint examination, testified that no identifiable latent fingerprints were found on the guns or the shotgun shells. A latent print from the passenger side of the truck matched that of Cantrell. TBI Special Agent Dan Royce, who was stipulated as an expert in ballistics, testified that all of the shells recovered at the scene had been fired from the Charles Daley .12 gauge semi-automatic shotgun.

Dr. Amy McMaster, Deputy Chief Medical Examiner for Davidson County, who was stipulated as an expert in forensic pathology, testified that both victims died as a result of a single shotgun wound to their heads. Mrs. Pelham's wound was characterized as a close range shotgun wound with an entry on the right side of her head that caused "a very large devastating wound that extended across the front of her face and onto the left side of her head . . . [that] basically destroyed the vast majority of Mrs. Pelham's facial structures, including her eyes and her nose." She described Mr. Pelham's wound as entering from the right side of the back of his neck. Although there was no visible soot around the entry wound as in Mrs. Pelham's wound, shotgun wadding was found in Mr. Pelham's brain, indicating that the wound was inflicted at a somewhat close range.

Donald Young testified that he was working at the VFW on Monday, March 1, 2004, when the defendant came in to cash a check. Young stated that he cashed a check for eighty dollars made out to the defendant on Mr. Pelham's account. He recalled that the check was dated February 29, 2004. Kelly Gasaway, a local banker, identified the signature card from the Pelhams' checking account. He also identified the check written to the defendant on February 29. When asked by investigators to compare the signatures, Gasaway concluded that the signatures did not match and that someone had forged Mr. Pelham's signature on the check.

Rebecca Cantrell testified that her brother, William Ray Cantrell, lived with her in February 2004. She recalled that the family had driven to Dalton, Georgia to visit a sick family member on February 28 and had returned home sometime during the afternoon of February 29. She recalled going out to eat dinner with her brother in the early evening but recounted that when they returned home, he spent a lot of time at the neighbors' house, the Edge family. She also recalled seeing a green truck at the Edges' home. She stated that her brother had a drug problem, and she did not want other drug people coming to her house. Although she did not know the defendant personally, he had been at her house a week before the murders looking for her brother. She recalled that her brother was in and out most of the night but that he was home when she went to bed at around 10:30 p.m.

Charles Thurman testified that he became acquainted with the defendant in December 2004 while incarcerated in the DeKalb County Jail. He stated that, one night over a game of cards, the defendant told him that he had committed the murders but would never admit it.

Margaret Waggoner, the defendant's mother, was called by the defense but refused to testify. The defense also called Joseph Lee Merriman who was the defendant's cellmate from mid-March 2004 until January 2005. He could not recall the discussion between the defendant and Thurman regarding the murders. He stated that no one trusted Thurman because they knew he had been transferred from another jail for causing problems and receiving threats. He said that in the ten months that he and the defendant shared a cell, the defendant never discussed the murders or theft with him. Merriman conceded on cross-examination that he was not with the defendant every minute so the statement reported by Thurman could have been made out of his presence.

## ADMISSIBILITY OF PRIOR CRIMES

The defendant contends that the trial court should not have admitted the January 5 burglary and theft of guns as prior bad acts committed by the defendant. Generally, evidence of other crimes committed by the defendant is not admissible. State v. Parton, 694 S.W.2d 299, 302-03 (Tenn. 1985). However, there are exceptions when the evidence is offered to prove a defendant's motive, identity, or intent, the absence of mistake, the opportunity to commit a crime, or as part of a common scheme or plan. Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). Pursuant to Rule 404(b) of the Tennessee Rules of Evidence, the trial court must satisfy the following conditions before evidence of other crimes may be admitted:

> (b) Other Crimes, Wrongs, or Acts. – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for such other purposes. The conditions which must be satisfied before allowing such evidence are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). When the trial court substantially complies with the requirements of Rule 404(b), we review the trial court's determination for an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The record reflects that the trial court held a pretrial hearing regarding the admission of the prior crimes relating to the January 5 incident. The state presented the testimony of Captain Collins

and Officer David Ward who testified at length regarding their investigation of the January 5 burglary and theft suffered by the Pelhams which ultimately led to the defendant's confession for those crimes. Captain Collins stated that the defendant blamed his drug addiction for his involvement in the January 5 crimes; and, although he never admitted to any involvement in the murder of his grandparents when questioned, the defendant did indicate that his drug addiction made him do things he normally would not do. Captain Collins also testified that two of the guns stolen in the January 5 incident and returned to the Pelhams were stolen again at the time of the murders. The court ruled that the evidence was admissible. Specifically, the court found that the burglary and thefts were relevant to the material issues of identity and motive. The court based its ruling on the fact that two of the guns stolen in the January 5 incident were also stolen again during the course of the murders, that the defendant confessed to the January 5 incident and that, during the investigation of the murders, he denied involvement in the murders but stated that his drug problem made him do things that he normally would not do. The court further found the proof of the other crimes to be clear and convincing based upon the defendant's confession to the offenses and subsequent work as a confidential informant in a controlled drug buy from his uncle. The court also found that the probative value of the evidence was "not substantially outweighed" by the danger of unfair prejudice posed by its admission.[1]

We find that the trial court substantially complied with the requirements of Rule 404(b). Clearly, the evidence is highly relevant to the identity of the perpetrator as well as a motive for the offenses. Proof of the January 5 incident is also clear and convincing given the defendant's confession to the offenses. Furthermore, as noted by the trial court, the proof in this case is largely circumstantial and the probative value of the evidence as relevant to the perpetrator's identity and motive is not outweighed by the danger of unfair prejudice. Therefore, we conclude that the trial court did not abuse its discretion in admitting the evidence of the defendant's prior crimes of burglary and theft.

## ADMISSIBILITY OF PHOTOGRAPHS

The defendant contends that the trial court should not have admitted three photographs taken of the victims at the crime scene because they were particularly inflammatory.[2] On appeal, the state contends that the trial court did not abuse its discretion in admitting the photographs "because the photographs at issue were clearly relevant . . . to assist the trier of fact" regarding the location of Mrs.

---

[1] The trial court utilized the weighing process of Tennessee Rules Evidence 403 which excludes otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," rather than the more stringent standard of Tennessee Rules of Evidence 404(b) that requires exclusion if the "probative value [of the evidence] is outweighed by the danger of unfair prejudice." The state appears to have the same confusion in its brief to the court.

[2] The three challenged photographs were admitted at trial as Exhibits 21, 22 and 29. However, the exhibits had been previously numbered as Exhibits 31, 32 and 41, respectively, for the purposes of any pretrial or jury-out hearings. In the course of pretrial hearings, some exhibits were either withdrawn or ruled inadmissible. Therefore, we will refer to the exhibits as they were numbered when admitted into evidence for the jury's consideration.

Pelham's body in relation to her purse and the manner in which Mr. Pelham's wound was inflicted. Two of the disputed photographs show Mrs. Pelham as she was found at the crime scene, sitting in her recliner in the living room. The third photograph shows the wound to the back of Mr. Pelham's head as he lay on the ground at the crime scene. During the jury-out hearing regarding the admissibility of the photographs, the state sought admission of the photographs as accurate depictions of the crime scene and as relevant to describe the injuries suffered by the victims. The trial court found that the photographs were admissible, stating:

> The court does not find that these are tremendously inflammatory, they would be admissible into evidence in this case and that they are necessary for the reasons stated on the record for the state to prove its case or help to prove its case.

The announcement of the trial court does little to illuminate the basis of relevance of the photographs or to explain the balancing process that led to the trial court's ruling.

As a general rule, all relevant evidence is admissible. Tenn. R. Evid. 402. However, even relevant evidence "may be excluded if its probative value is *substantially outweighed by the danger of unfair prejudice*, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403 (emphasis added). Photographs of a deceased victim may be admissible "if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). However, if they are not relevant, they may not be admitted to inflame a jury and unfairly prejudice the jury against a defendant. Id. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Id. As with any other form of evidence, the decision to admit photographs of a deceased victim lies within the discretion of the trial court, and we will not overturn that decision absent a clear showing of an abuse of discretion. State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998). The modern trend is to vest more discretion in the trial court's rulings regarding admissibility. Banks, 564 S.W.2d at 949.

The first photograph of Mrs. Pelham, Trial Exhibit 21, shows a side view of her body as she lay in her recliner. The picture is relevant to show the location of the victim and the condition of the crime scene. The photograph shows no signs of a struggle, making it more likely that the victim was killed by someone known to her. The picture is not particularly graphic and shows just a small amount of blood from the wound to the victim's face. We conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice and that the trial court did not abuse its discretion in admitting Exhibit 21 pursuant to Rule 403 of the Tennessee Rules of Evidence.

The second photograph of Mrs. Pelham, Trial Exhibit 22, shows a front view of the victim as she was discovered at the scene. The admission of this photograph requires more analysis and explanation. The color photograph is graphic and shows that the victim's face was basically obliterated by the wound. The victim's chest is covered with blood and brain matter. It also shows that the victim remained in her recliner while the shooter entered the room. As noted by our case

law for years, "[t]he more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." Id. at 951. Indeed, the record reflects that one juror had to be excused from service on the second day of trial due, at least in part, to viewing this photograph on the previous day. Thus, the danger of unfair prejudice is apparent from the record of this case. The question remains whether such danger substantially outweighed the probative value of the photograph.

During the jury-out hearing, the state argued that the photograph was relevant, in part, because it also showed the victim's opened purse nearby from which the defendant obtained the check he later cashed at the VFW. However, the next photograph admitted at trial, Trial Exhibit 23, shows a close-up of the purse, with a portion of the victim's leg and recliner included in the photograph, clearly demonstrating the proximity of the victim to her purse. Thus, the value of Exhibit 22 to illustrate the location of the victim's purse adds little weight in favor of admissibility.

Crime scene photographs are valuable to illustrate the injuries to a victim, as well as the mechanism and manner of infliction of the injuries. See, e.g., State v. Leach 148 S.W.3d 42, 63 (Tenn. 2006). However, when the facts and circumstances regarding a cause of death are clearly explained by expert testimony, it becomes more difficult to establish that the probative value of the particularly graphic photograph is not substantially outweighed by the danger of unfair prejudice. Banks, at 951-52. In this regard, we note that the state made the general assertion at the jury-out hearing that Exhibit 22 was relevant to show the condition and layout of the crime scene relative to the manner of infliction of the injuries on Mrs. Pelham. In addition to Exhibit 22, the state also introduced a crime scene video portraying the condition of the residence, that it had not been ransacked and the layout of the room in which Mrs. Pelham was discovered. However, the video does not contain any footage of the victim's body as found at the crime scene. In this regard, the photograph of Mrs. Pelham's body as she was found in her recliner was particularly probative of the location of furniture in the living room and a doorway from the kitchen as it related to location of her body. During the cross-examination of Dr. McMaster, the defendant utilized a crime scene diagram when questioning her regarding a possible location of the shooter. On numerous times during cross-examination, Dr. McMaster declined to offer an opinion regarding the location of the shooter, other than to reiterate that the wound was inflicted at close range from the right side of the victim's forehead. However, on redirect the state showed Dr. McMaster Exhibit 22, and she agreed that it was possible that the shooter could have walked behind through the kitchen doorway and reached from behind the chair to inflict the fatal shot.

Therefore, we conclude that the photograph was extremely probative to show the manner of infliction of the victim's injuries and to accurately depict the crime scene. The identity of the shooter was the main issue at trial. The nature of the victim's injuries and the manner in which they were inflicted both suggest that the victim was killed by someone known to her. Therefore, we conclude that the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice and that the trial court did not abuse its discretion in admitting this photograph.

The third photograph, Trial Exhibit 29, shows the entry wound injury to the back of Mr. Pelham's head. Based upon the state's assertions, the trial court admitted the photograph as probative of the manner and cause of death. We agree that the photograph was relevant to depict the manner of death and that it was not particularly gruesome. Therefore, we conclude that the trial court did not abuse its discretion in admitting this photograph.

CONSECUTIVE SENTENCING

In his last allegation of error, the defendant contends that the trial court erred in imposing consecutive life sentences for the two first degree murder convictions. He claims that the record does not support the trial court's finding that he is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation in committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The state responds that the record fully supports the trial court's determination that the defendant is a dangerous offender and that he committed the crimes while on probation. Tenn. Code Ann. § 40-35-115(b)(4) and (6).

Appellate review of the length, range, or manner of service of a sentence is de novo. Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn.1991). The burden is on the appellant to show the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b)(4) provides that a trial court may impose consecutive sentences if a defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995), our supreme court held that satisfying section 40-35-115(b)(4), by itself, is not sufficient to sustain consecutive sentences. If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. Id. Additionally, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The additional evidence considered at the sentencing hearing consisted of the testimony of Donna Dunlap, a Warren County probation officer who prepared the defendant's presentence report.

She testified that the defendant had been charged with escape while awaiting trial on the present offenses. She also indicated that the defendant was on probation for simple possession and pled guilty to a violation of probation while awaiting trial on the present offenses. Aside from these convictions, the defendant's criminal history consisted of various traffic offenses, a driving under the influence conviction and a worthless check charge that was still pending at the time of sentencing. Dunlap stated that the defendant told her he had a drug problem stemming from dental work performed in 1999. She also testified that the defendant declined to make a statement regarding the present offenses for which he stands convicted.

The state urged the court to impose consecutive sentences based upon the "dangerous offender" and "committed while on probation" factors of Tennessee Code Annotated section 40-35-115(b)(4) and (6). Additionally, while not presenting any testimony from the victim's family, the state indicated that "[t]he family has expressed a certain amount of concern as to [the defendant's] lack of remorse." The defendant argued that he did not qualify for consecutive sentencing because "his record of criminal activity is not extensive" without specifically addressing the dangerous offender or probation factors. The trial court concluded that consecutive sentences were appropriate based upon its finding by a preponderance of the evidence that the defendant is a dangerous offender and that he committed the present offenses while on probation. The trial court also found that the length of the sentence was reasonably related to the severity of the offenses.

We conclude that the evidence does not preponderate against these findings and that the record supports the imposition of consecutive life sentences for the first degree murder convictions.

**CONCLUSION**

In accordance with the foregoing, we conclude that the trial court did not err in admitting prior crimes of the defendant and did not abuse its discretion in admitting photographs of the deceased victims taken at the crime scene. We also conclude that the record supports the trial court's imposition of consecutive sentences for the first degree murder convictions. Therefore, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-12-