IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2009

**STATE OF TENNESSEE v. ANNETTE HAMBY
aka ANNETTE TRAN-MCNABB**

**Appeal from the Criminal Court for Bradley County
No. M-07-269     Carroll Ross, Judge**

———————————————

**No. E2008-02030-CCA-R3-CD - Filed December 1, 2009**

———————————————

The Defendant, Annette Hamby, appeals as of right from her Bradley County jury conviction for first degree premeditated murder. She contends that the evidence, which included proof of her intoxication, was insufficient for the jury to find beyond a reasonable doubt that she premeditated the crime. We affirm the judgment of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Charles Richard Hughes, Jr., District Public Defender (at trial), and John P. Fortuno, Assistant Public Defender (on appeal), for the appellant, Annette Hamby aka Annette Tran-McNabb.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Robert Steve Bebb, District Attorney General; and A. Wayne Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the June 10, 2007, shooting death of Jerry Burris, which occurred at the hands of his cousin, the Defendant, at the Defendant's Bradley County home. Bradley County Sheriff's Deputy Kristi Barton testified at trial that she pulled into the Defendant's driveway behind Deputy Jody Musselwhite, who left his vehicle and ran to the victim. She said a man standing on the residence's porch informed her that he had put the gun away and pointed upwards. She stated that when she looked up, she saw a gun lying sideways in the porch rafters.

Deputy Barton testified that she entered the home and found the Defendant sitting calmly in a chair with a cigarette in one hand and a telephone in the other. She said she instructed the Defendant to hang up the phone and put out her cigarette, but the Defendant instead handed the

phone to her. Deputy Barton stated that she discovered her dispatcher on the other end of the line, informed him that she was on the scene, and again told the Defendant to put out her cigarette. She said that as she was escorting the Defendant to an ashtray, the Defendant spontaneously announced, "I shot that son-of-a-bitch," and, as she was handcuffing her, protested: "I shot him. These ain't necessary. I don't need these cuffs. I'm not hiding from it. I'm not running from it. I told you I did it."

Deputy Barton testified that as she and the Defendant walked past the victim, the Defendant turned around and yelled to the emergency medical personnel, "Don't try to save him. He deserves to die. Don't try to save him." She said the Defendant continued her spontaneous comments during the twenty-minute trip to the criminal justice center, saying, "I shot him. I shot that son-of-a-bitch; I shot him; hope he's dead." She said the Defendant kept asking her if the victim was dead and when she finally replied yes, the Defendant commented, "Thank the Lord."

Deputy Barton characterized the Defendant's non-stop talk during the trip to the justice center as "babbling," testifying that the Defendant continually repeated that she had shot the victim, that she meant to do it, that she was thankful he was dead, and that she had shot him because he had killed her mother. She clarified, however, that the Defendant's speech was not slurred and that her words made sense in the context in which they were uttered. She said that she could smell alcohol on the Defendant's breath but that the Defendant was able to stand, walk, and put out her cigarette in a normal fashion, neither staggering nor fumbling in her actions.

Deputy Barton testified that as she and the Defendant were walking into the justice center, the Defendant told her that she would "get off" because she had been to Moccasin Bend Mental Health Institute and could prove she was crazy. She stated that she was present during Detective Hernandez's interview with the Defendant and that the Defendant said in the interview that her father would be next and that she should have shot him first. On cross-examination, Deputy Barton acknowledged that the Defendant made no attempts to flee or hide, commented after learning the victim was dead that her mother could now rest in peace, told the officers that her father had beaten both her mother and herself, and expressed anger toward the victim.

Linda Ballew, a paramedic with Bradley County Ambulance Service, testified that the victim was already dead when she arrived. She stated as she began her evaluation of the victim, the Defendant, who was being escorted to a patrol car, announced that she had killed the victim and that he had killed her mother. According to Ballew, the Defendant used an obscenity to refer to the victim, spoke clearly, and exhibited no difficulty walking. On cross-examination, she agreed that the Defendant appeared angry.

Detective Scotty Hernandez of the Bradley County Sheriff's Department testified that he interviewed the Defendant at the justice center on June 10, 2007. He stated that the Defendant told him that the victim had harmed her mother years ago and had to pay. The Defendant then related the following: that she planned to shoot the victim when he returned from a trip to the lake with the Defendant's husband; that she retrieved a gun from the residence when she saw the victim walking

up the driveway; that she went outside and waited until the victim got closer; that she closed the distance in order not to miss; that she said to the victim, "You killed my mother and now I'm going to kill you, you son-of-a-bitch"; and that she then shot the victim. Detective Hernandez testified that the Defendant told him that after the victim was on the ground, she walked back into the house and called 9-1-1.

On cross-examination, Detective Hernandez acknowledged that the Defendant expressed anger toward both the victim and her father during the interview. He also acknowledged the Defendant related an incident that occurred several years earlier in which the victim had struck the Defendant's mother in the head. He said the Defendant also told him that her father had abused both her mother and herself. He stated that he did not perform a blood-alcohol concentration test on the Defendant because he did not think it necessary, testifying that although he could smell that the Defendant had been drinking, "she was able to speak clearly, walk under her own power, perform motor skills, write her name, remember dates, remember times."

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Laura Hodge testified that elements of gunshot residue were present on the Defendant. TBI Special Agent Forensic Scientist Shelly Betts, an expert in firearms identification, testified that the weapon involved in the case was a Ruger, single-action, .44 Magnum revolver. She said that in order to fire a single-action revolver, one has "to first manually cock or thumb back the hammer" before squeezing the trigger.

Ross McNabb, the Defendant's father, testified in the Defendant's behalf. He said that approximately twelve years earlier, the victim threw a concrete duck at him after becoming angry at something he said. He said the duck missed him but struck his wife, the Defendant's mother, in the head. He testified that his wife was in a coma for approximately two weeks after the incident, remained hospitalized for four months, and sustained permanent brain damage as a result of the injury. He said that during the two years that elapsed before her death, the Defendant helped him care for her by giving her baths and attending to her personal grooming. He stated that, in his opinion, the victim was responsible for his wife's death.

Robert Wayne Hamby, the Defendant's husband, testified that on the day of the shooting, he was outside on the swing and had cleaned and reloaded his revolver, when he saw the victim approaching the house with the victim's girlfriend, Colleen Bryant. He said he hid the gun in the cushion because the victim was a thief. He stated that the victim asked to borrow his car dolly and he refused but that the victim kept hanging around the house. He testified that he finally asked the victim to accompany him on his boat because he knew that the Defendant did not like the victim and he wanted to get the victim away from the house.

Hamby testified that he and the victim returned home approximately two hours later. He said he had dropped the victim at the end of the drive and was in the process of backing up his boat when he heard a crack, got out to see if he had run over anything, and then saw Bryant running up the road yelling that the Defendant had just shot the victim. He stated that he ran to the house to find the

victim lying on his back and the Defendant inside calling 9-1-1. He described the Defendant as having the look of a wounded animal and said that she was running in circles and "babbling" that she had shot the victim and was glad but that she had not meant to shoot him.

Hamby testified that the Defendant was an alcoholic and regularly took the mood stabilization drug, Seroquel. He said she had been "drinking some" before the victim and his girlfriend arrived at the house but was not drunk. He testified that he had seen the Defendant intoxicated numerous times in the past and that when she was drunk, she frequently talked of her childhood and wept for her mother. He stated that the Defendant received disability benefits for mental issues, was "not the brightest bulb in the pack," and sometimes exercised poor judgment. However, in his opinion, she was not "crazy."

Hamby further testified that he found a prescription bottle of Oxycontin on the porch after the shooting. He said that he took the bottle to the sheriff's department but that officers told him it was not relevant to their investigation. He claimed, however, that Bryant was an Oxycontin addict and had been seen by the Defendant's brother putting Oxycontin in the Defendant's beer. On cross-examination, Hamby repeated that the Defendant was not drunk at the time of the shooting.

Alvin McNabb, the Defendant's brother, testified that the Defendant began drinking at approximately 9:30 a.m. on the day of the shooting. He stated that the victim and Bryant came to the Defendant's house at approximately 3:00 p.m. and that Hamby purchased the Defendant an additional twelve-pack of beer before leaving for the lake with the victim. McNabb said that he left the Defendant's house at about 5:30 p.m., before the shooting occurred. He testified that the Defendant blamed the victim for her mother's death and became upset about her mother whenever she drank alcohol.

The forty-six-year-old Defendant testified that she was disabled with bipolar disorder and schizophrenia, for which she had been prescribed Seroquel and Citalopram. She stated that she woke in a foul mood on the day of the shooting, drank heavily all day, and remained irritated and upset throughout the day. She said she was angry that her brother brought Bryant and the victim to her house and explained that she and the victim had been close before the 1995 incident with her mother but that she did not like him afterward. She also claimed that the victim was trying to get her hooked on methamphetamine and that his girlfriend kept "popping" hydrocodone pills and offering them to her. She could not, however, remember if she had taken any hydrocodone on the day of the shooting. She said that her anger toward the victim had been building for a long time but that she had not planned to shoot him and had not known that the gun was on the swing until she sat on top of it. Finally, she stated that she was just "fed up with everything" at the time she fired the shot. On cross-examination, she acknowledged having told her husband in a telephone conversation after her arrest that she was going to tell the police she could not remember what had happened.

Dr. Troy Gilson, a psychiatrist who conducted a forensic evaluation of the Defendant, testified as a rebuttal witness for the State that he had determined the Defendant to be competent to stand trial and that an insanity defense could not be supported. He further testified that the

Defendant had been diagnosed in the past with bipolar "NOS" and alcohol and cannabis dependence, but there was no record of her having ever been diagnosed with schizophrenia. On cross-examination, he conceded that individuals with bipolar disorder can sometimes exhibit impaired judgment.

Detective Scotty Hernandez, recalled as a rebuttal witness by the State, testified that one to two days after the shooting, Hamby brought him an Oxycontin bottle that he wanted collected as evidence. He said that he refused to do so because, to his knowledge, there had not been any prescription pill bottles at the scene of the shooting. Detective Hernandez also identified the audio recording of the Defendant's telephone conversation with her husband, which was subsequently admitted as an exhibit. In the conversation, the Defendant stated that she hated the victim, planned to plead not guilty by reason of insanity, and was going to tell the police that she could not remember what had happened.

The jury convicted the Defendant of first degree premeditated murder, and the trial court sentenced her to life imprisonment.

On appeal, the Defendant challenges the sufficiency of the convicting evidence, arguing "that the record establishes a killing premised on anger, passion, prescription medication, and alcohol rather than a premeditated and deliberate murder." The State argues that the evidence is more than sufficient to show premeditation. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree murder is defined as the unlawful, premeditated, and intentional killing of another. T.C.A. §§ 39-13-201, -202(a)(1) (2006). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the Defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness after the killing. Id. In addition, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient to sustain the Defendant's conviction for first degree premeditated murder. The Defendant appeared calm immediately after the shooting, made spontaneous comments to a sheriff's deputy and to a paramedic that she had shot the victim because he had killed her mother, and expressed on two separate occasions her belief that she would be able to claim insanity as a defense to the crime. She also admitted in her formal statement that before the fatal shot was fired, she had planned to shoot the victim, retrieved the weapon, waited for him to get close, moved closer to ensure the accuracy of her shot, and informed him that she was going to kill him and her reason for doing so. In addition, proof was presented that she would have had to cock the murder weapon in order for it to be fired. Finally, several witnesses, including the Defendant's own husband, testified that although the Defendant had been drinking, she did not appear intoxicated at the time of the shooting. From all of this evidence, a rational jury could have reasonably concluded that the Defendant premeditated the killing.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the Defendant's conviction for first degree premeditated murder.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE