# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 6, 2009 Session

## STATE OF TENNESSEE v. PATRICK TRAWICK

**Appeal from the Criminal Court for Shelby County**
**Nos. 02-08616 and 02-08617     James M. Lammey, Judge**

---

**No. W2008-02675-CCA-R3-CD - Filed June 9, 2010**

---

The Defendant, Patrick Trawick, was convicted by a Shelby County jury of one count of premeditated first degree murder and two counts of aggravated assault related to the death of his estranged girlfriend and the aggravated assault of her companion. The jury found life without the possibility of parole to be the appropriate sentence for the premeditated first degree murder count. Following a separate sentencing hearing, the trial court imposed concurrent six year sentences for the two aggravated assault counts to be served consecutively to the sentence of life without the possibility of parole. In this appeal as of right, the Defendant contends that the trial court erred by (1) failing to recuse itself, (2) ruling admissible for impeachment purposes the Defendant's prior rape conviction, (3) admitting crime scene photographs of the victim's body, and (4) failing to instruct the jury regarding all lesser included offenses for premeditated first degree murder. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P.  3 Appeal as of Right; Judgments of the Criminal Court**
**are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, attorneys for the appellant, Patrick Trawick.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; Betsy Carnesale and Greg Gilbert, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

# OPINION

Darryl Turner testified that he and Tujauna Smith, the deceased victim and the Defendant's ex-girlfriend, began dating four to six weeks before her death on September 30, 2002. He recalled that he had known the Defendant since 1999 when they met in prison. After Mr. Turner's release from prison, he and the Defendant became reacquainted. Mr. Turner stated that the Defendant was not happy about his relationship with the victim, but that he and the Defendant had never had any serious problems between one another. He stated that he offered to stop seeing the victim, but the Defendant told him that was not necessary. Mr. Turner and the victim continued to date. He also testified that on the day before the victim's death, the Defendant had been to Mr. Turner's mother's home and confronted the victim about her failure to bring their thirteen-month-old daughter to see him.

Mr. Turner testified that on September 30, 2002, the victim picked him up at his mother's house to go out to dinner. Not far from the home, the Defendant pulled up next to the victim in an attempt to get her to talk to him. She told the Defendant that she had nothing to say to him. Mr. Turner recalled urging the victim to talk to the Defendant in order to see what he wanted. However, the victim told Mr. Turner that the Defendant looked like he was reaching for a gun so she sped away.

Mr. Turner testified that the Defendant pursued them while the victim drove frantically, speeding to get away from the Defendant. During the pursuit, the victim stopped and the Defendant shot at them. Mr. Turner then told her to drive to the North Precinct of the Memphis Police Department. He recalled that as the victim sped toward the precinct, the Defendant maintained his pursuit. When the victim attempted to turn quickly, she hit a curb. Mr. Turner testified that he jumped out of the car and ran through the woods to the precinct. As he approached the precinct, the victim drove past him with the Defendant still following her.

Mr. Turner testified that he arrived at the precinct to report that he and the victim had been chased and shot at by the Defendant. About ten minutes after his arrival at the precinct, he recalled the officers telling him that there had been a shooting at a nearby Mapco gas station. He testified that not long after hearing of the shooting, the officers told him that the victim had been killed. After giving a full statement to the police, Mr. Turner identified the Defendant from a photographic lineup as the man who had chased and shot at them. Several months later, while both men were in jail, the Defendant told Mr. Turner that he never intended to harm Mr. Turner and that his problem was with the victim. During the conversation, the Defendant asked Mr. Turner not to testify against him. Mr. Turner stated that he felt obligated to testify because the victim had saved his life.

The deceased victim's cousin, Ranelle Duncan, testified that the victim had just turned nineteen-years-old on September 7, 2002. She said that the victim had two daughters, ages four-years-old and eleven-months-old. The younger daughter's father is the Defendant. Ms. Duncan said that the victim began living with her about three or four weeks before her death. She recalled that the victim and the Defendant argued sometimes but described their arguments as "nothing big." Ms. Duncan said that the victim began dating Darryl Turner about the time she moved into her residence. Ms. Duncan testified that the Defendant came by her home about a week before the victim's death. He dropped off some diapers for the baby and wanted to talk to the victim who was not home at the time. Ms. Duncan recalled that the Defendant was upset about the victim's absence and told her that the victim was "going to make me kill her." Ms. Duncan testified that she did not take his comment seriously and that she was not afraid of the Defendant that day at her house. Ms. Duncan said that she saw the victim and Mr. Turner earlier on the evening of the victim's death. She learned that the victim had been shot and killed sometime around 2:00 a.m. the next morning.

Raymond E. Williamson testified that he was an assistant manager at the Mapco Gas Station where the victim was killed. He had gotten off work at 10:00 p.m. but was at the store waiting for another employee whom he drove to work to end his shift at 11:00 p.m. He recalled seeing two cars pull up outside the store and seeing a man and a woman in an argument. Although he could not hear what was being said, he could tell they were arguing by their loud voices and hand gestures. Mr. Williamson said that the victim appeared very afraid and moved her hands in a defensive gesture. He described the Defendant as "agitated."

Mr. Williamson testified that the victim entered the store and the Defendant followed her with a gun in his hand. Mr. Williamson described the gun as a chrome-plated .45 caliber handgun that the Defendant held close to his chest as he entered the store. Near the front counter, the Defendant grabbed the victim and pistol-whipped her. Mr. Williamson testified that the Defendant told the victim to "get the f*** out of the store." Mr. Williamson began pushing the panic button to alert the police when the confrontation became physical. The victim broke away from the Defendant and ran to the back of the store. The Defendant followed her, broke the glass from a beer cooler, and soon caught up to the victim. Mr. Williamson testified that the Defendant shot the victim six or seven times, with the victim falling to the ground with the third shot. He said that the Defendant emptied his gun and ran from the store.

Mr. Williamson testified that he locked the doors of the store as soon as the Defendant exited the building. He recalled that the video surveillance cameras recorded the entire incident. The video was played for the jury during which time Mr. Williamson recalled that the Defendant held the victim for the first two or three shots and then let her fall to the

ground as he continued to shoot. He acknowledged that he was initially unable to identify the Defendant due to medication he took that affected his short-term memory. However, he identified the Defendant at trial.

Rodney Middlebrook testified that he was an employee at the gas station on the night that the victim was killed. He recalled that the victim and the Defendant came into the store at about 10:45 p.m. and that the victim was scared. He saw the Defendant pistol-whip the victim. When Mr. Middlebrook "hopped" the counter to escape the store, he heard gunshots. The Defendant left the store and drove away.

Torrance Holmes testified that he was a customer at the gas station and witnessed the altercation from the parking lot. He recalled that two cars came racing down the wrong side of the road and pulled into the parking lot. Mr. Holmes testified that the victim was scared. He said that the Defendant was angry with the victim and wanted to know why she was with another man. The Defendant also questioned whether his baby was in the victim's car with the couple. Mr. Holmes testified that the Defendant threatened to kill the victim and chased her into the store. From the parking lot, Mr. Holmes saw the Defendant choke and pistol-whip the victim. He saw the victim break free and run to the back of the store only to be chased and shot by the Defendant. He testified that the Defendant left the store and immediately went to check the backseat of the victim's car as if to see if the baby was inside the car. Finding no one else in the victim's car, the Defendant left the scene in his car. Mr. Holmes testified that he was trained in cardio-pulmonary resuscitation (CPR) so he entered the store to check on the victim. He described the scene as very bloody. When he checked the victim's condition, she had no pulse.

Rodarius Ellis testified that he was at the Mapco store talking to his friend, Torrance Holmes, when two cars drove into the parking lot. He said that he saw a man follow a woman into the store. He recalled that the man pistol-whipped the woman and followed her to the back of the store where he shot her. Before leaving in his car, the man checked the woman's backseat, as if he was looking for someone. Mr. Ellis said that he started to leave the store but returned at his girlfriend's urging because he knew CPR. However, when he returned to the store and checked the victim, she was already dead.

Memphis Police Department Officer Patrick Taylor testified that he responded to a report of a shooting at the Mapco station at approximately 10:30 p.m. When he arrived at the scene, everything looked normal so he assumed that the call had been a false alarm. However, Officer Taylor stated that when he entered the store, the clerk told him, "She's back there." In light of the clerk's calm demeanor, Officer Taylor still thought that the clerk was referring to a shoplifter; but as he rounded the corner of the aisle to the back of the store,

Officer Taylor saw a lot of blood and the victim's body. He secured the scene, separated the witnesses, and called an ambulance to the scene.

Sergeant Connie Justice of the Memphis Police Department testified that she was assigned the investigation of the case and acted as case coordinator. Sgt. Justice testified that, based upon the investigation that occurred throughout the night of the shooting, the police had centered their investigation on the Defendant by morning. However, the Defendant proved difficult to locate and was not arrested until May 2003. Cedric Thompson testified that he reported his white Mercury Mystique stolen some time before the victim's death. He also said that he never gave the Defendant permission to drive his car. Sgt. Justice testified that a Mercury Mystique found abandoned near the scene was processed and that a bullet found in the vehicle was matched to those taken from the victim's body. She said that there were no fingerprint comparisons made from any found on the vehicle.

Memphis Police Department Officer Steven Ford testified that he helped secure the scene at the Mapco station and also spoke to Mr. Turner at the precinct. He said that he went to the area where Mr. Turner told him the victim had run over the curb and confirmed that there were skid marks on the road. He also retrieved a "slug" from the drywall of the store and sent it to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. Officer Shan Tracy testified that he completed the crime scene sketch of the Mapco station which was admitted into evidence at the trial. He recalled finding the victim's car keys in a pool of blood. He also stated that no shell casings or bullets were found in the parking lot of the store.

Francis Donald Carpenter testified that he was the crime scene technician with the Memphis Police Department who processed the abandoned Mercury Mystique. He discovered a shell casing on the driver-side floor of the vehicle and one round of ammunition imbedded in the passenger-side door. The bullet had also shattered the passenger-side window. He recalled that the driver-side window was shattered also but found no evidence that a bullet had traveled through the window. He opined that the noise and force of firing a gun inside the vehicle could have caused the driver-side window to shatter. TBI firearms technician Alex Brodhag testified that he analyzed the bullets and casings found at the scene and in the Mercury Mystique. He determined that the casings and bullets were fired from the same .45 caliber handgun.

Dr. O'Brian Cleary Smith testified that he served as the Shelby County Medical Examiner from 1983 until February 2004, but was privately employed at the time of trial. He performed the autopsy on the victim and determined that she had suffered four gunshot wounds. One bullet entered at the top of her head and traveled at an angle to rest in her brain. A second bullet entered near her right shoulder, severed her spinal cord and came to

rest in her chest cavity. A third bullet entered her right shoulder and exited her back. The fourth bullet entered the front of her right leg and exited the back of her leg. Although unable to determine the order in which the wounds were inflicted, Dr. Smith opined that the wound to her head would have produced instant death; the wound to her spinal cord would have been fatal eventually; but the two other wounds would have been survivable.

The Defendant recalled Ms. Duncan to testify more extensively about her conversation with the Defendant the week before the victim's death. She stated that the Defendant was angry that the victim and their baby was not home when he came by with the diapers and that he told Ms. Duncan the victim was going to make him kill her. She admitted that she did not take his comment seriously. However, when asked to describe the Defendant's behavior toward the victim, Ms. Duncan testified that the Defendant was jealous. On cross-examination, Ms. Duncan described the Defendant as disappointed that the victim was not at home. She also admitted that she "never dreamed that [the Defendant] would chase [the victim] through a Mapco and gun her down."

Based upon this proof, the jury convicted the Defendant, as indicted, of premeditated first degree murder and two counts of aggravated assault. Following the bifurcated sentencing hearing, the jury found beyond a reasonable doubt the existence of one statutory aggravating circumstance, that the Defendant was previously convicted of the prior violent felony of rape, and the jury unanimously agreed that life without the possibility of parole was the appropriate sentence.

## ANALYSIS

### *Recusal of Trial Court*

The Defendant argues that the trial court should have recused itself "despite its own obvious inability to preside impartially" over the trial. The Defendant contends that the trial judge's previous employment as a Shelby County Assistant District Attorney created a bias as evidenced by the trial judge's reference to the prosecution as "we." The Defendant also cites to several areas of testimony that were admitted in favor of the State as instances of the trial judge's partiality toward the State. On appeal, the State correctly notes that the Defendant failed to request the trial judge's recusal at any point during the trial. The Defendant acknowledges that he failed to object to specific instances of bias, but he contends that the trial judge should have recused itself sua sponte.

The decision to grant a motion for recusal lies solely within the trial court's discretion. Caruthers v. State, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). This Court may reverse the trial judge's decision only when the judge has clearly abused that discretionary authority.

State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). A judge should recuse himself or herself whenever the judge's "impartiality [could] reasonably be questioned." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (quoting Code of Judicial Conduct, Canon 3(c) (now part of Tenn. Sup. Ct. R. 10, Canon 3(E)(1)). Furthermore, recusal is appropriate "when a person of ordinary prudence in the judge's position ... would find a reasonable basis for questioning the judge's impartiality." Id. (footnote omitted). Therefore, any trial judge addressing a motion for recusal must determine whether he or she has a subjective bias against the defendant and whether the trial judge's impartiality could reasonably be questioned under an objective standard. State v. Connors, 995 S.W.2d 146, 148 (Tenn. Crim. App.1998).

The State correctly notes that the Defendant did not file a motion to recuse the trial judge or raise any contemporaneous objections relevant to the trial judge's participation in this case when the specific instances of alleged bias occurred. However, the record reflects that the Defendant did refuse to sign a waiver of disqualification prior to trial which it appears the parties addressed as a motion to recuse. During the hearing on this issue, the trial judge affirmed that he had no prior knowledge of the case derived from his employment as a prosecutor and that the case was transferred to his court after his appointment to the court. After noting that he was one of "around a hundred attorneys" in the Shelby County District Attorney's Office at the time of his election to the trial bench, the trial judge elaborated further and stated that:

> I had no contact with this case, was not involved with any matter with this case, no knowledge of the facts, and the fact that I've been presiding over this case for a couple of years now almost, and almost from day one have had dealings with this matter [as a trial judge], and it's never been brought up before until trial date, and we have a jury out in the hall. I don't see any reason why I should recuse myself . . . .

As recently discussed by this court in State v. Ernest Gentry Burton, No. M2008-00431-CCA-R3-CD, 2009 WL 2382284, *11 (Tenn. Crim. App. Aug. 3, 2009), perm. app. denied (Tenn. Dec. 14, 2009), "While a party should seek to take whatever action reasonably available to prevent or nullify an error[,] a trial judge must disqualify himself sua sponte under certain circumstances." Generally, the trial judge's decision to recuse is a matter of his or her discretion. State v. Smith, 906 S.W.2d 6, 11 (Tenn. Crim. App.1995). On appeal, this court will not reverse the decision of the trial judge unless the evidence in the record indicates an abuse of that discretion. State v. Pannell, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001).

The Defendant cites Rule 10, Canon 3(E) of the Tennessee Supreme Court Rules in support of his argument that the trial judge should have recused himself sua sponte from the trial in this case. This rule states that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." The rule lists various circumstances where impartiality might be questioned. See Tenn. R. Sup. Ct. Rule10, Canon 3(E). Notably, the Defendant cites to none of these specific circumstances but instead makes a general allegation that the trial judge was biased in favor of the prosecution as evidenced by several adverse rulings and that this bias was the result of the trial judge's prior employment as an assistant district attorney. Unlike the defendant in Burton, the Defendant makes no specific allegations that the trial judge previously participated in prosecuting the Defendant or has any specific knowledge of the Defendant's background derived from his prior employment as an assistant district attorney, and none is apparent from this record. Generally, adverse rulings alone do not evince a showing of judicial bias sufficient to require recusal. See, e.g., Herrera v. Herrera, 944 S.W.2d 379, 397 (Tenn. Ct. App. 1996). Therefore, we conclude that the Defendant's argument must fail and that the record does not show that the trial judge abused his discretion in refusing to recuse himself, sua sponte or otherwise, from these proceedings.

*Admission of Rape Conviction for Impeachment*

The Defendant argues that the trial court erred in ruling a prior rape conviction admissible as impeachment evidence pursuant to Tennessee Rule of Evidence 609. He contends that the trial court failed to weigh properly the probative value of the prior conviction versus its prejudicial effect and that "the obvious behavioral nexus between the rape of a woman and the first degree murder of a woman" concerning violent behavior inflicted against women rendered the prejudicial effect of the evidence too great to allow admission. The State contends that the trial court properly determined that the rape conviction could be admitted as impeachment and that if any error occurred, it was harmless in light of the overwhelming proof of the Defendant's guilt. The Defendant argues that this error cannot be deemed harmless in light of his decision not to testify caused by the ruling. Therefore, he argues that the jury was unable to hear his version of events, which differed dramatically from the proof presented by the State, specifically concerning his state of mind.

The record reflects that during a pretrial hearing on the issue the trial court ruled admissible the Defendant's 1995 rape conviction based upon its characterization that rape was "a crime of moral turpitude"and that "someone [who] commits a rape would not be someone who would be considered particularly moral." The trial court also ruled that "just because it's a felony makes it admissible" and "weighing that against the unfair prejudice, I think it should be admissible if [the Defendant] elects to testify." Following the Defendant's decision not to testify – which he attributed to the trial court's ruling – the trial

court elaborated on its ruling and stated that because Mr. Turner testified candidly about his prior criminal record and having met the Defendant while in prison, the trial court thought it "unfair" that the Defendant would be allowed to testify subject only to impeachment by his 1993 theft conviction. The trial court ruled that the rape conviction was probative of the Defendant's truthfulness and that the probative value of the evidence outweighed the prejudicial effect.

Although the Defendant declined to present an offer of proof during the trial, he reserved the right to do so at the motion for new trial hearing. However, at the motion for new trial hearing, the trial court refused to allow the Defendant to present his offer of proof. Instead, the trial court permitted counsel to summarize the Defendant's testimony. Defense counsel stated that the Defendant would have testified that he and the victim had a tumultuous three-year relationship that had only recently ended when she died. He would have testified that after their break-up, he had great difficulty seeing their ten-month-old daughter because the victim would keep the child from him and refuse him access to the child. He would have testified that on the night of the victim's death he saw the victim while driving, and that the victim and Mr. Turner actually chased him and fired the first shots. The Defendant also would have testified that the victim telephoned him on his cellular phone and told him to follow her to the Mapco station. He admitted that the couple argued about their daughter and the victim's relationship with Mr. Turner. However, the Defendant would have testified that the victim made a remark to him that their child had performed sexual acts with Mr. Turner, and the Defendant just "snapped," following her into the store and ultimately shooting her.

Rule 609(a)(3) of the Tennessee Rules of Evidence allows for the admission of a prior conviction to impeach the credibility of a defendant testifying at trial. Prior to its admission, the trial court is required to determine whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on substantive issues." Tenn. R. Evid. 609(a)(3). This court will only reverse a trial court's decision only if the trial court abused its discretion. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App.1995).

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should consider (1) the relevance of the impeaching conviction with respect to credibility, and (2) the similarity between the crime in question and the underlying impeaching conviction. State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003). This court has held that a prior rape conviction may be admissible for impeachment purposes under Rule 609. State v. O.B. Freeman Green, Jr., No. 02C01-9901-CC-00036, 1999 WL 675352, at *3 (Tenn. Crim. App. Sept. 9. 1999), perm. app. denied (Tenn. Apr. 24, 2000). The fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not

automatically require its exclusion. State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997); State v. Miller, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). However, if "the prior conviction and instant offense are similar in nature the possible prejudicial effect increases greatly and should be more carefully scrutinized." Long v. State, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). The trial court must analyze the prior conviction and the offense on trial to determine if the conviction's probative value on credibility is outweighed by the danger of unfair prejudice.

In this case the trial court determined that the Defendant's prior conviction for rape was a "crime of moral turpitude" and probative of the Defendant's credibility. The trial court further determined that the rape conviction should be admissible because the impeachment of the Defendant should not be limited to only his 1993 theft conviction. We cannot conclude under the circumstances of this case that the trial court abused its discretion in determining that the probative value of the Defendant's rape conviction relative to credibility outweighed any danger of unfair prejudice to the Defendant. Accordingly, the Defendant is not entitled to relief on this issue.

*Admission of Photographs of Deceased Victim*

The Defendant argues that the trial court should not have admitted photographs of the deceased victim taken at the crime scene because they were impermissibly inflammatory and gruesome and the State's purpose in utilizing them concerned undisputed evidence – the location of the bullets and casings found at the scene. The State contends that the photographs were not extremely gruesome and were relevant to describe the crime scene and show that the victim was trying to escape from the Defendant at the time of her attack. The State also argues that the photographs were not graphic. Therefore, the State contends that the trial court did not abuse its discretion in admitting the photographs. Following our review, we agree with the State.

As a general rule, all relevant evidence is admissible. Tenn. R. Evid. 402. However, even relevant evidence "may be excluded if its probative value is *substantially outweighed by the danger of unfair prejudice*, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403 (emphasis added). Photographs of a deceased victim may be admissible "if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Likewise, if they are not relevant, they may not be admitted to inflame a jury and unfairly prejudice the jury against a defendant. Id. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Id. As with any other form of evidence, the decision to admit photographs of a deceased victim lies within the discretion of the trial court, and we will not overturn that decision absent a clear showing

-10-

of an abuse of discretion. State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998). The modern trend is to vest more discretion in the trial court's rulings regarding admissibility. Banks, 564 S.W.2d at 949. As relevant to this case, crime scene photographs are valuable to illustrate the injuries to a victim, as well as the mechanism and manner of infliction of the injuries. See, e.g., State v. Leach 148 S.W.3d 42, 63 (Tenn. 2006).

The photographs depict the victim's body as it was found at the scene, including the location of shell casings found nearby and the victim's attempt to flee to the backroom of the store to escape the Defendant. The photographs are relevant to show the Defendant's pursuit and assault of the victim. While the photographs clearly show the extent of the victim's injuries from multiple gunshot wounds, we disagree with the Defendant that these photographs are particularly gruesome or horrifying. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photographs.

*Failure to Instruct the Jury on All Lesser Included Offenses*

In his final issue, the Defendant argues that the trial court committed reversible error by denying his request to instruct the jury regarding all lesser included offenses of first degree murder. The State concedes that the trial court did not instruct the jury regarding all lesser included offenses but contends that any error arising from this failure was harmless beyond a reasonable doubt in light of the jury's verdict of premeditated first degree murder. The record reflects that the Defendant filed a specific written request for jury instructions on all lesser included offenses of premeditated first degree murder including second degree murder, voluntary manslaughter, reckless homicide, criminally negligent homicide, reckless aggravated assault, assault, and reckless endangerment. The trial court instructed the jury regarding only premeditated first degree murder, second degree murder, and voluntary manslaughter after ruling that the evidence did not support an instruction for reckless homicide or criminally negligent homicide or any other lesser included offenses.

Both parties correctly note that a defendant has a constitutional right to full and complete charge of all lesser included offenses charged in the indictment. State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). When an issue is raised regarding the trial court's failure to instruct on a lesser included offense, our analysis typically involves a determination of: (1) whether the offense is a lesser included offense under the test adopted in State v. Burns, 6 S.W.3d 453 (Tenn. 1999); (2) whether the evidence supports an instruction on the lesser included offense; and (3) whether the failure to instruct on the lesser included offense constitutes harmless error. State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

With these considerations in mind, we note that reckless homicide and criminally negligent homicide are lesser included offenses of premeditated first degree murder under

Burns.  Regarding whether the evidence supports the instruction, our supreme court formulated a two-step analysis to assist in that determination: first, determine if any evidence exists that reasonable minds could accept as to the lesser offense; and second, determine by viewing the evidence liberally in the light most favorable to the existence of a lesser included offense, whether the evidence is sufficient to support a conviction for the lesser included offense.  State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002).  "The evidence, not the theories of the parties, controls whether an instruction is required."  Allen, 69 S.W.3d at 188.

Criminally negligent homicide requires proof a killing resulted from conduct when a defendant "ought to be aware of a substantial and unjustifiable risk" that a death will occur.  Tenn. Code Ann. §§ 39-11-302(d) and 39-13-212.  Reckless homicide requires proof of a killing resulting from conduct when a defendant "is aware of but consciously disregards a substantial and unjustifiable risk" that a death will occur.  Tenn. Code Ann. §§ 39-11-302(c) and 39-13-215.  The evidence in this case shows that the Defendant approached the victim while driving the streets of Memphis with the intention to assault her.  The Defendant shot at the victim's vehicle.  The Defendant pursued the victim through the Mapco station, grabbing her and pistol-whipping her at the front counter, before trapping her and shooting her to death in the doorway to the back room of the store.  Based upon this evidence, we agree with the trial court that the evidence did not support an instruction on criminally negligent homicide or reckless homicide.  The trial court's refusal to give these instructions or any other lesser included instructions was not error.

We further note that our supreme court has also held that "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense . . . the jury necessarily rejected all other lesser offenses" rendering the failure to charge on all lesser included offenses "harmless beyond a reasonable doubt."  State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998).  Such is the situation in the present case; by finding the Defendant guilty of premeditated first degree murder, the jury necessarily rejected all the instructed lesser included offenses and the trial court's failure to charge on any other lesser included offenses would be deemed harmless beyond a reasonable doubt.  Accordingly, we conclude that the Defendant is not entitled to relief for this alleged error.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-12-